**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Eddie Wayne ROBERSON,
Defendant–Appellant.**

No. 88–1624.

United States Court of Appeals,
Fifth Circuit.

April 28, 1989.
Rehearing Denied May 24, 1989.

598

Ralph H. Brock, Lubbock, Tex., (court-appointed), for defendant-appellant.

Delonia A. Watson, Asst. U.S. Atty., Dallas, Tex., Rogers McRoberts, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Lubbock, Tex., for plaintiff-appellee.

Before GEE, SMITH and DUHE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

I. *Factual Background.*

In November 1987, Eddie Wayne Roberson, who was on parole after recently being released from prison, was searching for work. Roberson met Jack Doherty, an eighty-four-year-old man who was in poor health, had poor vision, and required someone to assist him with his daily needs. Apparently, Doherty also drank heavily at times. Roberson moved in with Doherty, assisting him with household duties, taking him to the doctor and grocery store, and performing other daily tasks in exchange for room and board.

One evening, a few days after Roberson moved in, Doherty had a coughing fit while intoxicated.[1] During the spell, Doherty fell and struck his head on a table. When Roberson heard the fall, he rushed to Doherty's assistance, but could not find a pulse or detect any breathing. Fearing that the police would think he killed Doherty, Roberson panicked and fled the scene. After driving around town for a few hours, Roberson returned to Doherty's home. Doherty was, indeed, dead by this time. Roberson wrapped the body in a quilt, cleaned the blood from the floor, flipped the mattress on the bed to hide more blood, and changed his own blood-stained clothes. The unusual events in this case then turned bizarre.

In a state of panic, Roberson put Doherty's body in the trunk of Doherty's car and drove around Texas for several days. Throughout this expedition, Roberson used Doherty's credit card to pay for food, gasoline, clothes, and hotel rooms. Roberson was apparently drinking heavily during this period. He testified that he wanted to bury the body, but could not because the ground was frozen. Finally, Roberson found a garbage dumpster near a vacant lot, placed the body in the dumpster, doused it with diesel fuel, and ignited it. The body was burned beyond recognition.

Still fearing murder charges, Roberson purchased an airplane ticket with Doherty's credit card and flew to Kansas to visit a female friend. Although Roberson intended to stay in Kansas, his friend convinced him to return to Texas. Roberson did so, but did not turn himself in. Instead, he spent several days drinking heavily and using Doherty's credit card and car. In total, Roberson charged about $6,700 on Doherty's credit card before the police apprehended him.

Finally, the state police arrested Roberson in Texas for public intoxication. While he was handcuffed and sitting in a patrol car, Roberson overheard a comment about Doherty's credit card on the patrol car's radio. He then managed to reach into his pocket, extract the credit card, and hide it in the seat of the car.

The police questioned Roberson about Doherty and the credit card. Roberson maintained that he knew nothing about a credit card and that Doherty was alive, well, and at home. When the police found the credit card in the patrol car and confronted Roberson with it, he began to explain the situation and to cooperate with the state prosecutor. The state district attorney's office agreed not to seek the death penalty in any murder case against Roberson and not to prosecute Roberson on the property charges if Roberson would cooperate.

Roberson agreed. He then showed the police where the body was, gave two confessions, took a polygraph, and explained the charges on Doherty's credit card bills. No federal agencies participated in the agreements with Roberson.

The State of Texas twice sought a murder indictment against Roberson, but the grand jury returned a no-bill both times. Roberson eventually was indicted under Texas law for abuse of a corpse, but has

---

1. The account of the evening in question is solely from the obviously self-serving testimony of Roberson, the only live eyewitness to the event.

not been tried on this charge. Finally, Roberson was indicted for the federal offense of abuse of an access card, a crime more commonly known as credit card fraud.

At trial, Roberson contended that he had permission to use the card and that he planned to repay Doherty with a $5,000 inheritance he was expecting. The jury convicted him.

Roberson objected to the pre-sentence report which the magistrate used as the basis for computing his sentence under the Sentencing Guidelines ("Guidelines"). The sentencing judge overruled these objections. Pursuant to the Guidelines, the judge found aggravating circumstances which the Sentencing Commission ("Commission") had not taken into account that rendered inadequate a sentence within the range shown by the Guidelines. As the Guidelines require, he provided a "statement of reasons" for his departure from their provisions.

Although the Guidelines recommended a 30–to–37–month sentence, Roberson was sentenced to 120 months in prison and two years' supervised release. He was also ordered to pay a $50 special assessment, and restitution to Manufacturers Hanover Trust, the issuer of Doherty's credit card. Roberson now appeals, arguing that the sentence imposed under the departure provisions of the Guidelines was inappropriate on several grounds and that he should have been immune from federal prosecution per his agreement with the state prosecutor. We affirm.

## II. *The Sentencing Guidelines.*

Under the Guidelines, now held to be constitutional in *Mistretta v. United States,* —— U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), Congress has instructed sentencing courts to "impose a sentence sufficient, but not greater than necessary," to address the following goals:

... (A) to reflect the seriousness of the offense, to promote respect for the law,

and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To facilitate this task, the Commission has established a Sentencing Table listing recommended ranges of sentences and devised a method for determining which range is appropriate for a particular defendant.

The vertical axis of the Sentencing Table designates the offense level. The Commission has created a point system for determining a defendant's offense level. The Guidelines ascribe a "Base Offense Level" for each covered offense. For example, the abuse-of-access charges against Roberson fall into the fraud and deceit offense category and carry a base offense level of 6. Guidelines § 2F1.1.

After finding the base offense level, the district court then adjusts the offense level by accounting for a variety of factors listed in the "Offense Conduct" and "Adjustments" sections of the Guidelines. *See generally id.* chaps. 2, 3. In this case, the Guidelines directed the court to add points to the base offense level in relation to the amount of money involved in the transactions. *Id.* § 2F1.1(b). As Roberson's transactions amounted to $6,700, his "offense conduct" justified a two-point increase from the base offense level. The Guidelines also instructed the court to make two upward "adjustments": The court added two points under section 3A1.1 because Roberson's actions involved a "vulnerable victim," and two points under section 3C1.1 because Roberson obstructed justice. When the court added the adjustments to the base offense level, it arrived at an offense level of 12.[2]

---

**2.** The Guidelines also contemplate, where appropriate, downward adjustments in the offense level. For example, Roberson requested a two-

point reduction because he cooperated with the police. The court could have made this adjustment under § 3E1.1, but declined to do so.

The horizontal axis of the Sentencing Table accounts for the defendant's criminal history, grouping criminal backgrounds into six categories; category VI represents the most active criminal past. The criminal history categories, like the offense levels, work on a point system, assigning points to certain events in the defendant's criminal record. Roberson's active criminal past earned him a spot in category VI.

After the court has determined the appropriate offense level and criminal history category, it uses the table to find the recommended sentencing range. The range for an offense level 12 and criminal history category VI is 30 to 37 months. Although the Commission contemplates that, in most cases, courts will impose a sentence within the recommended range, the sentencing process does not always end when the court identifies that range.

■ The Guidelines circumscribe the court's sentencing discretion, but do not eliminate all judicial discretion from the sentencing process. In general, "[t]he court shall impose a sentence of the kind, and within the range [set forth in the Guidelines]." 18 U.S.C. § 3553(b). The court may depart from the Guidelines, however, if it "finds that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Commission in formulating the guidelines...." *Id.*[3] Whenever it sentences a criminal defendant, a court must "offer reasons explaining why the departure is justified in terms of the policies underlying the [Guidelines]." *Mejia–Orosco*, 867 F.2d at 221; 18 U.S.C. § 3553(c).

If the court imposes a sentence exceeding the recommended range, it must state "the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). However, the sentencing judge need not "... incant the specific language used in the guidelines...." *United States v. De Luna–Trujillo*, 868 F.2d 122, 124 (5th Cir. 1989). We require only "that the court

identify clearly the aggravating factors and its reasons for connecting them to the permissible grounds for departure...." *Id.*

The court's discretion to depart from the Guidelines is broad. As the Commission explained,

> The new sentencing statute permits a court to depart from a guideline-specified sentence only when it finds 'an aggravating or mitigating circumstance ... that was not adequately taken into consideration by the Sentencing Commission ...'. 18 U.S.C. § 3553(b). Thus, in principle, the Commission, by specifying that it had adequately considered a particular factor, could prevent a court from using it as grounds for departure. In this initial set of guidelines, however, the Commission does not so limit the courts' departure powers. The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

Guidelines, Resolution of Major Issues (Policy Statement); *see also id.* § 5K2.0 ("Grounds for Departure (Policy Statement)").

The Commission has identified a list of factors which it was unable to take into account and that may constitute grounds for departing from the Guidelines. *See id.* §§ 5K2.0 to 5K2.10. In addition, the Commission recognizes that "[a]ny case may involve factors in addition to those identified that have not been given adequate consideration by the Commission. Presence of any such factor may warrant departure from the Guidelines under some circumstances, in the discretion of the sentencing judge." *Id.* § 5K2.0. With limited exceptions, "the Commission [did] not in-

---

**3.** *See United States v. Mejia–Orosco,* 867 F.2d 216, 219 (5th Cir.) (per curiam), *on petition for* rehearing, 868 F.2d 807 (5th Cir.1989).

tend to limit the kinds of factors (whether or not mentioned anywhere else in the Guidelines) that could constitute grounds for departure in an unusual case." *Id.,* Resolution of Major Policy Issues (Policy Statement).

Finally, Congress also provided direction for appellate review of a sentence imposed under the Guidelines. When a defendant challenges a sentence exceeding the recommended range, appellate courts are to review the record to

> determine whether the sentence ... is outside the range of the applicable sentencing guideline, and is unreasonable, having regard for (A) the factors to be considered in imposing a sentence ... and (B) the reasons for the imposition of the particular sentence, as stated by the district court....

18 U.S.C. § 3742(d)(3). Furthermore, review should "give due regard to the opportunity of the district court to judge the credibility of the witnesses, and ... [should] accept the findings of fact of the district court unless they are clearly erroneous." *Id.* § 3742(d). The Guidelines allow the district court to depart from the recommended sentence if the court finds aggravating or mitigating circumstances which the Commission did not consider adequately. 18 U.S.C. § 3553(b).

Congress limited the resources which the district court may use to determine whether the Commission has given adequate consideration to a factor, instructing that a sentencing court shall consider only the Guidelines, the policy statements, and the official commentary of the Commission. *Id.* Roberson contends that our review is similarly limited. However, as revealed by the following analysis, we need not delve deeply into the Guidelines nor go beyond the material which the district courts may consider in order to conclude that the Commission did not contemplate that a credit card fraud case would also involve concealing, disposing of, and burning a corpse. Accordingly, we do not decide whether our inquiry into the Guidelines is restricted in the same manner as is the district court's.

### III. *Departure from the Guidelines.*

After finding the recommended range on the Sentencing Table, the district court here departed from the Guidelines, imposing a 120–month sentence, the statutory maximum, upon Roberson. The court gave three reasons for its choice of sentence: (1) Roberson's conduct was "extreme conduct" under section 5K2.8; (2) criminal history category VI does not adequately reflect Roberson's criminal record or his propensity for future criminal activity; and (3) the recommended sentence was neither adequate punishment nor fair to the United States. Roberson attacks the court's first and second reasons for departing from the Guidelines.[4] We reject these challenges.[5]

### A. Extreme Conduct.

■ Roberson's conduct is the type of "extreme conduct" justifying departure from the Guidelines. In its "Statement of Reasons" for the sentence, the district court explained that

> § 5K2.8 provides that the court may depart from the guidelines if the defendant's conduct was unusually heinous, cruel, brutal or degrading to the victim. I believe that the record in this case certainly supports that basis for departing from the Guidelines. Mr. Roberson failed to report the victim's death. The record shows, in my view, that Mr. Roberson did desecrate the body of Mr.

---

4. Roberson also contends that the departure is inconsistent with the purpose of the Guidelines, which he contends is to impose uniform sentences that do not reflect the sentencing judge's personal attitudes. However, the government correctly reminds us that uniformity is not the Commission's only goal and that the Commission does not seek to strip the sentencing judge of all discretion.

5. In the early cases following *Mistretta,* numerous issues regarding the Guidelines are being raised, predictably, as *res novae.* Here, defendant Roberson, through his court-appointed counsel, has presented us with several resourceful arguments questioning the district court's utilization of the Guidelines. Although we affirm the sentencing court on these various points, as discussed *infra,* we note that counsel's able presentation has significantly assisted the court in deciding these issues.

Doherty, and that Mr. Roberson then used Mr. Doherty's credit card after Mr. Doherty's death, all of which are examples of extreme conduct which warrant the guideline departure.

Roberson raises four challenges to the finding of extreme conduct: 1) that the "harm" which the court used as its reason for departing is not related to the offense of conviction; 2) that Doherty is not a "victim" for purposes of the Guidelines; 3) that 120 months is unreasonable in that it is disproportionate to analogous federal and state offenses; and 4) that the district court actually disregarded the Guidelines and imposed a sentence under the statute that designates the offense. The government counters that Roberson's behavior does fall within the Guidelines' notions of extreme conduct and, alternatively, that even if Roberson's conduct does not constitute "extreme conduct," the court was free under *other of the Guidelines' provisions* to consider that conduct as a ground for departure.

### 1. *Offense of Conviction.*

■ We begin by noting that section 5K2.8 does not require a relationship between the conduct which the court finds "extreme" and the offense of conviction:

> If the defendant's *conduct* was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the Guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation. [Emphasis added.]

In a separate section of the departure provisions, the Commission warns that "[h]arms identified as a possible basis for departure from the Guidelines should be taken into account only when they are relevant to the offense of conviction, within the limitations set forth in § 1B1.3". Guidelines § 5K2.0. Under section 5K2.0, therefore, the court may use the *harm to the victim* as ground for departure only if it finds a nexus between that harm and the offense of conviction.

Presumably equating the "harm" contemplated by section 5K2.0 with the extreme conduct described in section 5K2.8, Roberson contends that section 5K2.0 applies to section 5K2.8 and requires a link between the "harm" which the court identifies under section 5K2.8 and the offense of conviction. Accordingly, because concealing and burning Doherty's body is unrelated to the elements of abuse of an access card, Roberson maintains that this conduct cannot be a basis for departing from the Guidelines under section 5K2.8. However, this argument misconstrues section 5K2.8.

Section 5K2.8 directs the sentencing court's attention to the defendant's conduct, not the victim's harm, and thus does not implicate the limiting language in section 5K2.0. The Commission has identified a variety of factors that may justify a departure from the recommended sentence, some focusing upon the defendant's conduct and others upon the harm which the victim suffered.

■ For example, sections 5K2.1 and 5K2.2 allow the court to depart from the Guidelines if the victim of the offense suffered death or serious physical injury. The victim's harm is the focal point of these sections; hence the limitation in section 5K2.0 applies to them. Section 5K2.8, on the other hand, permits the court to depart from the Guidelines if the defendant acted in a manner that constitutes "extreme conduct." The victim's injury or harm is not germane to section 5K2.8, under which the court considers only the defendant's conduct. Section 5K2.8 simply does not include "harms identified as a possible basis for departure." Therefore, the limitation found in section 5K2.0 does not apply.

In this case, the district court relied upon section 5K2.8 and referred to the conduct found to be extreme, not to any "harm" which Doherty suffered. Whether the conduct—or harm, as Roberson describes it— is related to the abuse of an access card is irrelevant.

■ Moreover, we conclude that even if the limitation in section 5K2.0 did apply to the extreme-conduct provision, Roberson's

conduct would qualify as such. Under that section, a harm must be relevant to the offense of conviction "within the limitations set forth in § 1B1.3." Section 1B1.3 defines the conduct which the court may consider when it computes the offense level and includes

all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense.

Concealing and burning the body, refusing to report the death, and using the credit card after Doherty's death are all acts and omissions occurring during Roberson's abuse of an access card. Thus, even if we were to extend the qualifying language in section 5K2.0 to section 5K2.8, Roberson's conduct still would constitute "extreme conduct" under the Guidelines.

Sections 5K2.0 and 5K2.8 aside, the government is correct that the court also could have relied upon *any* of Roberson's activities as grounds for departing from the Guidelines. The Commission has established a two-step process for selecting a sentence. As the first step, the court computes the offense level and the criminal history category, finding the recommended range that corresponds to its calculations. The Commission has defined precisely what the court may consider during this step, limiting the inquiry to a specific list of factors. *See* Guidelines § 1B1.3.

For the second step, the court determines the appropriate sentence, either selecting a sentence within the recommended range or departing from the Guidelines. The Commission again has defined what information is relevant to the court's inquiry but has chosen not to limit that inquiry: "In determining the sentence to impose within the Guideline range, or whether a departure from the Guidelines is warranted, the court may consider, *without limitation, any information concerning the* background,

character and *conduct of the defendant,* unless otherwise prohibited by law. *See* 18 U.S.C. § 3661." Guidelines § 1B1.4 (emphasis added).

 Explaining the distinction between sections 1B1.3 and 1B1.4, the Commission notes that the former

prescribes rules for determining the applicable guideline sentencing range, whereas § 1B1.4 ... governs the range of information that the court may consider in adjudging sentence once the Guideline sentencing range has been determined. Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable Guideline sentencing range. *The range of information that may be considered at sentencing is broader than the range of information upon which the applicable sentencing range is determined.*

Guidelines § 1B1.3, commentary (emphasis added). *See also id.* § 1B1.4, commentary. Hence, although concealing and igniting Doherty's corpse are not elements of abuse of an access card, the court could consider this conduct when it calculated the recommended range *and* when it decided whether to depart from the Guidelines. Even without section 5K2.8, the court's grounds for departure would be cognizable under the Guidelines.

#### 2. *Victim.*

 Roberson's alternative argument is that Doherty is not a "victim" for purposes of section 5K2.8. As discussed *supra,* that section allows the court to consider whether the defendant's conduct "to the victim" is extreme. According to Roberson, the only victim in this case is Manufacturers Hanover Trust, the credit card issuer; as that bank was not a victim of that portion of Roberson's conduct that was "extreme," the access-card abuse does not fall under section 5K2.8. Roberson also maintains that section 5K2.8 contemplates a "live" victim, thereby precluding any potential role for Doherty as a cognizable victim.

The government, citing Guidelines § 2F1.1, responds that the definition of a

victim varies with the context of the offense and that Doherty qualifies as a victim for purposes of Roberson's conduct. In addition, the government contends that the sentencing judge may consider the defendant's background, character, and conduct, without limitation. Consequently, the government asserts that even if Doherty were not a victim, the court could consider Roberson's conduct toward the corpse as an appropriate factor.

In essence, Roberson is asking us to add a new requirement to section 5K2.8, an invitation which we decline. Under Roberson's rule, the court could not rely upon that section unless the victim were directly the victim of the offense of conviction. When it defined the type of conduct that would justify departure, however, the Commission chose not to require a nexus between the victim and the elements of the offense of conviction.

As discussed *supra,* in section 5K2.0 the Commission expressly required such a link between the harms upon which the sentencing judge may rely and the offense of conviction. But it did not include a similar requirement in section 5K2.8; instead, the Commission provided, in a different section, that the sentencing judge may consider, "without limitation, any information concerning the ... conduct of the defendant." *Id.* § 1B1.4. Accordingly, under section 5K2.8 the sentencing court has access to an uncircumscribed range of information. It is not our role to rewrite the section so as to limit the scope of that information.[6]

### 3. *Analogous Offenses.*

■ We also disagree with Roberson's third contention, that his sentence was un-

reasonable in comparison to those for what he maintains are the analogous offenses of desecrating a corpse under Texas state law and desecrating the flag under federal law. Roberson's conduct reflects a scheme to avoid detection so he could continue to live on Doherty's credit. This scheme is not comparable to mere desecration of a body or a flag, and the sentences for those offenses are not instructive as to whether the 120–month sentence is unreasonable.

### 4. *The Guidelines and the Statutory Maximum.*

■ Finally, the court did not simply ignore the Guidelines, as Roberson charges, and impermissibly impose the statutory maximum sentence of 120 months. Roberson is mistaken in his assertion that, because section 3553 provides that the sentencing court "shall" impose a sentence that is within the recommended range, the Guidelines have replaced the sentences found in the various statutes that define federal offenses. Under Roberson's interpretation of section 3553, the court must stay within the recommended range in all cases. This argument relies upon reading the language of section 3553 out of context. Read correctly, section 3553 merely directs the court to impose a sentence within the recommended range *unless* it finds grounds for departing from the Guidelines. Were we to follow Roberson's construction, a sentencing court could never depart from the Guidelines, and the elaborate departure provisions would be mere surplusage.

■ Furthermore, Roberson's rule would render the statutory maximum sentences meaningless, as these sentences

---

**6.** Roberson's proposed rule would lead to anamolous results. As an illustration, we present the hypothetical case of a bank robber who, in the course of the robbery, holds a teller at gunpoint, threatening to maim or kill him. The defendant bargains with the prosecutor, who agrees to drop all charges relating to the defendant's threatening conduct toward the teller. The defendant is tried and convicted of robbing the bank. Under Roberson's rule, the court could not consider Roberson's threatening conduct under § 5K2.8: Only the bank qualifies as a victim, as only it was affected by the offense

of conviction (the robbery). Fortunately, however, the Commission has instructed the sentencing judge to consider all of the defendant's conduct, allowing the judge to examine the whole course of events leading to the conviction. In the case of the hypothetical robber, and in Roberson's case, there are two victims: the victim of the offense of conviction and the victim who suffered from the defendant's conduct. If the defendant's conduct toward either victim is extreme, it is an appropriate basis for departure.

would remain in force but could never be imposed. The better reading is that the court must impose a sentence within the recommended range unless it finds grounds for departure. Upon finding such grounds, a court may choose an appropriate sentence, with the statutory maximum acting as a ceiling on the length of permissible sentences. *See United States v. Fisher*, 868 F.2d 128, 130 (5th Cir.1989) (imposing statutory maximum sentence).[7]

### B. Criminal History.

It was not unreasonable for the district court to depart from the recommended range on the ground that criminal history category VI does not fairly reflect Roberson's criminal history or propensity for future criminal conduct. The district court found that Roberson's 1979 conviction included three burglary cases that were consolidated for sentencing. In addition, the court found that Roberson has never completed successfully a period of parole or probation and that he has been incarcerated for felony convictions almost continuously since he was seventeen years old.

Roberson concedes, as he must, that the court may depart from the recommended range if the criminal history category underrepresents the defendant's history or propensity for future criminal conduct. *Fisher*, 868 F.2d at 129; *De Luna–Trujillo*, 868 F.2d at 124–25. Contending that the court should not have departed, however, he challenges the court's holding on three grounds: (1) that prior consolidated sentences will not support a finding that the criminal history category is inaccurate; (2) that the court did not explain why 120 months, as opposed to 30 to 37 months, was a reasonable sentence; and (3) that rather than departing from the Guidelines, the court should have simply increased the offense level and chosen another sentence from the sentencing table.

We agree with the government that a sentencing court may account for concurrent sentences, such as the 1979 sentences, when it decides whether departure based upon criminal history is appropriate. In any event, the court here relied upon two legitimate and independent bases for finding criminal history category VI inadequate: that the category reflects neither Roberson's history of criminal activity *nor* his propensity for future criminal conduct.[8]

#### 1. *Consolidated Sentences.*

■ Contrary to Roberson's assertion, the Guidelines require consideration of consolidated sentences, such as the 1979 sentence, in deciding whether departure is in order. In the "Definitions and Instructions for Computing Criminal History," the Commission has directed that "[p]rior sentences imposed in unrelated cases are to be counted separately. Prior sentences imposed in related cases are to be treated as one sentence." Guidelines § 4A1.2(a)(2). The

---

**7.** *See also United States v. Taylor*, 868 F.2d 125, 127 (5th Cir.1989) ("[W]here the Sentencing Guidelines would have indicated a longer term of imprisonment, the statutory maximum must be imposed."); *United States v. Savage*, 863 F.2d 595 (8th Cir.1988) (holding that where a recommended sentence under the Guidelines is less than the statutory minimum, a sentencing court must disregard the Guidelines and impose at least the minimum sentence under the statute).

 Although defendant does not directly raise the issue, we also note that the mere fact that a departure sentence exceeds by several times the maximum recommended under the Guidelines is of no independent consequence in determining whether the sentence is reasonable. *See United States v. Juarez–Ortega*, 866 F.2d 747 (5th Cir.1989) (per curiam) (upholding a departure sentence more than 4 times as long as the maximum recommended under the Guidelines);

*United States v. Guerrero*, 863 F.2d 245 (2d Cir. 1988) (more than 5 times the maximum); *United States v. Correa–Vargas*, 860 F.2d 35 (2d Cir.1988) (more than 4 times); *United States v. Nuno–Huizar*, 863 F.2d 36 (9th Cir.1988) (per curiam) (more than 3 times). Hence, the fact that Roberson was sentenced to about 3½ times the maximum recommended under the Guidelines is of no special significance.

**8.** In *Fisher*, 868 F.2d at 130, we emphasized the propensity to commit future crimes, based upon such factors as being frequently incarcerated and failing to complete parole, as a legitimate reason for departure. We concluded that "the district court was justified in concluding that the only reliable way to keep Fisher from driving stolen trucks is to keep him in prison." The district court properly applied a similar analysis to Roberson in this case.

Commission explains this provision in the commentary:

> Cases are considered related if they (1) occurred on a single occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing. The court should be aware that there may be instances in which this definition is overly broad and will result in a criminal history score that underrepresents the seriousness of the defendant's criminal history and the danger that he presents to the public. For example, if the defendant commits a number of offenses on independent occasions separated by arrests, and the resulting criminal cases are consolidated and result in a combined sentence of eight years, counting merely three points for this factor will not adequately reflect either the seriousness of the defendant's criminal history or the frequency with which he commits crimes. In such circumstances, the court should consider whether departure is warranted. *See* section 4A1.3.

Thus, the court merely was complying with the Guidelines when it accounted for Roberson's 1979 consolidated sentence.

### 2. *Explanation of Specific Sentence.*

▇▇ Secondly, the court's choice of 120 months, as opposed to any other number, is not unreasonable merely for lack of an explanation. When the court departs from the Guidelines, it must state "the specific reason for the imposition of a sentence different from [the recommended range.]" 18 U.S.C. § 3553(c)(2). The district court gave three reasons for imposing a sentence exceeding the recommended range and thereby fulfilled its duty under section 3553. *See Mejia–Orosco,* 867 F.2d at 221; *De Luna–Trujillo,* 868 F.2d at 124. Nothing in section 3553 requires the sentencing judge to justify his choice of sentence further by explaining, for example, why 120

months is more appropriate than 100 months.

Moreover, the Commission has anticipated that some cases require sentences in excess of the highest recommended range. In general, the Commission intends sentencing courts to use the next higher criminal history category when they find that the applicable category is not adequate. Guidelines § 4A1.3. The Commission has qualified its expectation, however, explaining that

> [t]he Commission contemplates that there may, on occasion, be a case of an egregious serious criminal record in which even the Guideline range for a Category VI criminal history is not adequate to reflect the seriousness of the defendant's Criminal History. In such a case, a decision above the Guideline range for a defendant with a Category VI Criminal History may be warranted.

*Id.* The district court found this to be such a case, a finding which Roberson does not challenge on the merits and that does not appear to be clearly erroneous.[9] Given that the court made the required statement of reasons and that the Guidelines contemplate sentences that exceed the category VI range, we are unable to conclude that 120 months is unreasonable.

### 3. *Next Offense Level.*

▇▇ Roberson also maintains that the court should have gone to the next *offense level* when it found the highest criminal history level to be inadequate. The Guidelines, however, instruct the court to move only between criminal history categories when it finds the applicable category inadequate. Guidelines § 4A1.1. The factors relevant to the offense levels are distinct from those pertinent to the criminal history categories. Each recommended range reflects the appropriate sentence for each combination of offense level and criminal history factors. Arbitrarily moving to a

---

**9.** "We will affirm sentences imposed by district judges who made factual findings that are not nearly erroneous and who apply the [G]uidelines to those findings." *Mejia–Orosco,* 867 F.2d at 221. This is part of the "due deference" which we are required to give "to the district court's application of the guidelines to the facts." *Id.* (quoting the Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, 1988 U.S.Code Cong. & Ad.News (102 Stat.) 4181, 4417) (codified at 18 U.S.C. § 3742(e)).

new offense level when the highest criminal history category proves inadequate would skew the balancing of factors which the Commission created in the Sentencing Table.

The recommended range for the next offense level may inform the court's choice of sentence. But the court is not required to abdicate its discretionary role and adopt the sentence for the next offense level simply because category VI is inadequate. The approach taken by the district court in this case with respect to consideration of criminal history is indistinguishable from those which we have approved in *Fisher*, 868 F.2d at 128–30, and *De Luna–Trujillo*, 868 F.2d at 124–25.

### IV. *Application of Guidelines.*

 Whether a sentencing court correctly determined the recommended range under the Guidelines is important to our evaluation of whether a sentence imposed under the departure provisions is reasonable. As noted above, even if the court decides to depart, it must impose a reasonable sentence. The recommended range provides a point of reference for the sentencing court; it is a range of sentences that the Commission determined is reasonable and against which the sentencing court may measure its choice of sentence.

 If the court identifies the wrong recommended range, its frame of reference may be skewed. A sentence that exceeds the Guidelines may look reasonable when compared to one recommended range, but unreasonable when compared to another. Accordingly, whether the court incorrectly determined the recommended range is relevant to our review of a sentence imposed under the departure provisions.

In undertaking such review, we apply the clearly-erroneous standard, as the Guidelines' provisions that direct the court's computation of the recommended range require a factual inquiry. 18 U.S.C. § 3742(d). Reviewing the district court's sentence calculation, we conclude that it properly applied the Guidelines.

The court adjusted the base offense level upward in accordance with three of the Guidelines' provisions. Roberson challenges two of these adjustments, as well as the court's refusal to make a downward adjustment. Specifically, he contends that the court erred when it found (1) that Doherty was a vulnerable victim, (2) that Roberson obstructed justice, and (3) that Roberson did not accept personal responsibility for his criminal conduct.

### A. Vulnerable Victim.

 Doherty is a vulnerable victim for purposes of adjusting the base offense level. The Guidelines direct the court to increase the offense level by two levels "[i]f the defendant knew or should have known that the victim of the offense was unusually vulnerable due to *age*, physical or mental condition, or that the victim was particularly susceptible to the criminal conduct...." Guidelines § 3A1.1 (emphasis added).

Roberson contends that the vulnerable-victim adjustment does not apply because Doherty was not a victim. In particular, he maintains that Doherty was not a "victim of the offense" of credit card fraud and that Doherty did not suffer any "harm" as defined under the Guidelines. In answering this argument, we refer to the commentary to section 3A1.1, where the Commission explains that the vulnerable victim adjustment "applies to any offense where the victim's vulnerability *played any part* in the defendant's decision to commit the offense." (Emphasis added.)

Roberson would require the vulnerable victim to be a victim of the offense of conviction. However, when the Commission has wished to require a link between the offense of conviction and a factor the court could consider in sentencing, it has expressly included that requirement in the Guidelines. For instance, as noted above, if the court relies upon the harm to a victim, the harm must be related to the offense of conviction. *Id.* § 5K2.0. Conversely, the Commission has chosen not to require a nexus between the offense of conviction and the victim.

Moreover, "conduct that is not formally charged or is not an element of the offense

of conviction may enter into the determination of the applicable Guideline Sentencing range." *Id.* § 1B1.3, commentary. Roberson's conduct toward Doherty is not an element of the abuse-of-access charge, but the court nevertheless could consider it under the Guidelines. Finally, we reason that if Doherty is a victim for purposes of the extreme-conduct provision, he should also be a victim for purposes of the vulnerable victim provision. Nothing in the statute or the Guidelines suggests to the contrary.

Roberson's contention that the ajdustment does not apply because Doherty did not suffer any harm warrants only cursory discussion. First, the adjustment provision does not require harm, but only a vulnerable victim. Consequently, whether a corpse may suffer harm is irrelevant. Second, although Doherty did not experience physical pain or monetary loss as a result of Roberson's actions, he certainly suffered indignity in having his corpse abused and his good name brought into this whole sordid affair.

B. Obstruction of Justice.

█ Roberson next contends that the court erred in increasing the offense level in response to his efforts to obstruct justice. Section 3C1.1 provides that the court should increase the offense level by two "[i]f the defendant willfully impeded or obstructed or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense...." *Id.* § 3C1.1. The district court found that Roberson attempted to obstruct justice when he hid the credit card in the patrol car seat.

Roberson challenges the court's adjustment on two grounds: First, he maintains that the adjustment is not mandatory and that his cooperation with the police should mitigate his initial efforts to conceal his wrongdoing; second, he suggests that there must be a link between the efforts to obstruct justice and the offense of conviction, and that he tried to hide the card to avoid a murder charge, not the abuse-of-access charge. The government responds that Roberson cooperated with police only

after they offered him a deal and that his cooperation accordingly should not mitigate his initial efforts to conceal his conduct.

█ The Guidelines imply that the adjustment for obstructing justice is mandatory. Section 3C1.1 is a directive to the court, instructing it to increase the offense level if it makes specific findings. Hence, if the court finds that the defendant obstructed justice, it must make the upward adjustment.

Furthermore, even if the adjustment was not mandatory, the court properly applied it in this case. Roberson's cooperative efforts should not mitigate his initial obstruction. He did not offer to cooperate until the police found the credit card, confronted him with the evidence, and offered him a deal. Apparently, he cooperated not because he wanted to do the right and honorable thing, but in order to help himself, an effort which should not cure his initial wrongdoing.

As for Roberson's second argument, his attempt to conceal the credit card *is* tied to the offense of conviction. Although section 3C1.1 does not expressly require a link between the offense of conviction and the obstruction, it refers to a defendant's efforts to obstruct the "instant offense." This reference arguably requires a nexus between the obstruction and the offense at issue in the case.

We need not decide that issue here, however, as that link is present in this case, in any event. Although Roberson contends that he hid the credit card to obstruct the investigation or prosecution of a murder charge, not the investigation of an abuse-of-access charge, we reject this fine distinction, which rests upon the premise that Roberson knew what charges awaited him and sought to avoid only the state murder charge. We refuse to attribute such rational decision making to a person who drove around with a corpse for several days, burned it, panicked, fled the jurisdiction, and ultimately was arrested for public intoxication. We infer that the district court found that Roberson was trying to obstruct investigation of *all* of his conduct, without regard for which offenses he was

concealing. We see no error in this finding.

## C. Acceptance of Responsibility.

■■■■■ Finally, the court did not err when it refused to reduce the offense level to account for Roberson's cooperation. Under section 3E1.1, the court may reduce the offense level by two points "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct...." *Id.* § 3E1.1. The standard of review under this provision is more deferential than under the clear error standard, because "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review and should not be disturbed unless it is without foundation." *Id.* § 3E1.1, commentary; *United States v. Thomas,* 870 F.2d 174, 176–77 (5th Cir.1989).

Roberson contends that he did everything which the Commission listed as examples of acceptance of responsibility under section 3E1.1. Nevertheless, we agree with the government that he was not entitled to a reduction, as he never accepted responsibility for his criminal actions. To begin with, we note that the commentary to section 3E1.1. explicitly precludes a reduction for acceptance of responsibility "where a defendant ... obstructs justice (*see* § 3C1.1), regardless of other factors." Hence, as Roberson obstructed justice under section 3C1.1, a downward adjustment under section 3E1.1 was not available to him.

Furthermore, even without this commentary, the failure to make the adjustment would not have been error. Roberson cut a favorable deal with the state prosecutor—a deal that guaranteed that he could not receive the death penalty if convicted of Doherty's murder. We cannot conclude that the court's refusal to grant the reduction in offense levels is "without" foundation, even though Roberson's cooperative efforts do generally correspond with the examples of conduct which the Commission felt reflect an acceptance of responsibility. We reemphasize that Roberson's actions did not stem from a desire to accept personal responsibility for his conduct; rather, they were part of a very favorable agreement. Given the deference due the district court, *see, e.g.,* 18 U.S.C. § 3742(e), we can find no error.

In conclusion, Roberson's claims that the district court improperly calculated the recommended range under the Guidelines must be rejected. Consequently, there is no indication that the court's vantage point in imposing its sentence under the departure provisions was in any way obscured.

## V. *State Immunity and Defendant's Due Process Rights.*

Finally, Roberson contends that his federal prosecution violates his due process rights because the *state* prosecutor agreed not to prosecute him if he cooperated with the state investigation. No federal prosecutors participated in the agreement, which provided immunity from state prosecution only. Roberson nevertheless insists that the federal prosecutor was somehow bound by his deal with the state.

■■■■ Because Roberson did not raise the issue of immunity at trial, he has waived any such challenge. *Battle v. United States Parole Comm'n,* 834 F.2d 419, 421 (5th Cir.1987); *United States v. Saimiento–Rozo,* 676 F.2d 146 n. 3 (5th Cir.1982). Specifically, if a defendant wishes to raise the defense of immunity, he must do so at or before trial or risk waiving the defense, subject to the appellate court's plain-error analysis. *United States v. Brimberry,* 744 F.2d 580, 586–87 (7th Cir.1984) (referring to Fed.R.Crim.P. 12(b)); 8 J. Moore, *Moore's Federal Practice* ¶¶ 12.02[1], 12.03 (2d ed. 1989); 1 C. Wright, *Federal Practice & Procedure* § 193 (2d ed. 1988).

Relying upon *Brimberry,* Roberson maintains that we may address an issue which he did not raise if the trial court should have considered it *sua sponte.* However, Roberson misunderstands the analysis in *Brimberry.* There, the court indeed held that the defendant waived his immunity defense at trial but that the court

of appeals could address the issue because the trial court committed plain error when it did not raise the issue *sua sponte. Id.* The court found plain error because the defendant presented the plea agreement to the trial judge, who should have recognized the immunity issue. *Id.*

 Accordingly, under *Brimberry* we may address an issue which the defendant waived only if we find plain error. As discussed *infra,* the state immunity agreement did not bind the federal prosecutor, and therefore the court did not commit plain error by allowing the federal prosecution to proceed.

Citing *Rowe v. Griffin,* 676 F.2d 524 (11th Cir.1982), Roberson contends that the federal prosecutors should have honored the state agreement. In *Rowe,* the court enjoined a state criminal prosecution which the state initiated after it had guaranteed the defendant immunity in exchange for his cooperation. The *Rowe* court established a three-part test for determining whether a prosecutor must honor an agreement:

> ... [T]he government ought to be required to honor such an agreement when it appears from the record that: (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government.

*Id.* at 527–28.

We conclude that the instant agreement fails the *Rowe* test with respect to the federal prosecution, simply because no "agreement was made" with federal prosecutors or regarding federal prosecution. If state agreements that immunize criminal defendants from state charges could bind federal prosecutors, state prosecutors would be able to usurp federal prosecutorial discretion.

Nor did the state prosecutor in this case have any authority to bind the federal prosecutor. Under settled precedent, one federal prosecutor cannot bind his or her counterpart in another district unless he or she has been given the authority. *See United*

*States v. D'Apice,* 664 F.2d 75, 78 (5th Cir. Unit B Dec. 1981). If federal prosecutors cannot bind other federal prosecutors with their unauthorized acts, a state prosecutor *a fortiori* should not be able to do so.

Roberson further asserts that the state agreement should bind the federal prosecutor by extension of *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). There, the defendant in a state proceeding invoked his fifth amendment privileges on the ground that his testimony would incriminate him with respect to potential state charges. After the state offered immunity from the state charges, the proceedings resumed. The defendant again refused to testify, this time asserting that his testimony would incriminate him with respect to federal charges. The Waterfront Commission ordered the defendant to testify or risk contempt charges. The Court held that

> ... a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him.

*Id.* at 79, 84 S.Ct. at 1609. Roberson asserts that compelled testimony and plea agreements are analogous, but fails to explain the analogy.

Patently, *Murphy* is distinguishable from the instant case. In *Murphy,* the defendant was stuck between the proverbial rock and a hard place: He could testify, and incriminate himself, or he could invoke the fifth amendment, and risk contempt charges. As a result, the defendant had no real choice but to testify, a result which would offend fifth amendment principles. Preserving the values underlying that amendment was critical to the *Murphy* court.

To the contrary, in this case Roberson was not compelled to do anything. He bargained with the state, convincing it to forego state property offense charges and the death penalty in exchange for his cooperation. Roberson does not suggest that

the state coerced him to accept the agreement or that he did not understand its terms; there is no reason why he could not have demanded federal immunity or refused to cooperate. Neither the state nor the federal prosecutor ever forced Roberson to incriminate himself; hence, the interests that were critical to the *Murphy* court are not involved here.

For the foregoing reasons, the conviction and sentence of the district court are AF-FIRMED.