UNITED STATES of America,
Plaintiff–Appellee,

v.

James M. ELIASON, Defendant–
Appellant.

No. 92–1245.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 19, 1993.

Decided Sept. 3, 1993.

Mark D. Pollack, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Div., Barry R. Elden, Asst. U.S. Atty., Matthew C. Crowl (argued), Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Locke E. Bowman, III (argued), MacArthur Justice Center, Chicago, IL, for defendant-appellant.

Before BAUER, Chief Judge, COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

The defendant, James Max Eliason, pled guilty to a conspiracy to transport stolen vehicles in interstate commerce in violation of 18 U.S.C. §§ 2312, 2313. In his plea agreement, Eliason reserved the right to appeal the district court's denial of his request for a *Kastigar* hearing to determine if the federal government was guilty of using immunized testimony against him. *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). We affirm.

## I. *BACKGROUND*

Between March and October of 1986, James Max Eliason participated in a conspiracy to transport stolen vehicles in interstate commerce. Eliason and co-defendant Michael Pusateri worked together to acquire possession of stolen automobiles in Memphis, Tennessee, and to arrange for their transportation to Chicago, Illinois. Once the vehicle arrived in Chicago, Pusateri and the third co-defendant Arthester Purnell proceeded to obtain fraudulent title and registration papers for the stolen car. Eliason and Pusateri would in turn sell the vehicle.

In separate incidents in March and April of 1986, Eliason and Pusateri received a 1985 Cadillac and a 1986 Dodge Leisure Van, both of which had been stolen in Memphis. Additionally, in early April 1986, Eliason and Pusateri arranged for the transportation of a stolen 1986 Nissan 300ZX from Memphis, to Chicago and then to Florida. In July 1986, Eliason sold the Nissan in Tampa, Florida, along with a fraudulent Tennessee Department of Revenue application for certificate of title and a fraudulent motor vehicle registration.

In September 1986, Florida authorities apprehended Eliason for drug trafficking activities. During the drug investigation and while awaiting trial, Eliason was charged with dealing in stolen property, namely the Nissan 300ZX he sold in Tampa. His attorney Nicholas Matassini, negotiated a plea agreement, in which Eliason entered a guilty plea on March 17, 1987 to the drug charges

while the stolen property charges were dismissed. The agreement also provided Eliason immunity from prosecution by the State of Florida on the auto charges premised upon his continued cooperation with Detective William Todd of the Tampa Police Department.[1] At Detective Todd's instructions, Eliason placed several monitored telephone calls to Memphis in an effort to induce Verdell Loggins, who was a car thief and acquaintance of Eliason's but not charged in this conspiracy, to barter stolen automobiles for narcotics. Unbeknownst to Detective Todd and Eliason, Loggins was also cooperating with the FBI in Memphis and had allowed the FBI to monitor Eliason's calls. After Detective Todd discovered this, he informed Eliason that his cooperation would no longer be necessary.

On September 25, 1991, a Federal Grand Jury returned a one-count indictment against Eliason, Pusateri and Purnell. The indictment charged Eliason and Pusateri with conspiring to transport and sell at least four stolen motor vehicles in interstate commerce, and specifically charged Eliason with transporting and selling the stolen Nissan 300ZX. Eliason made a motion for a *Kastigar* hearing to determine whether the federal prosecutors were making use of information provided by Eliason to Florida authorities under what Eliason characterizes as a grant of immunity. *See Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In response to this motion, the government filed affidavits from the two assistant U.S. attorneys and the two FBI agents who had been involved in Eliason's federal prosecution. Each affiant stated that he or she lacked any knowledge (1) of the State of Florida entering into a grant of immunity with the defendant Eliason; (2) of information Eliason provided to Tampa police regarding the Nissan 300ZX; or (3) that they had used information obtained from Eliason under the grant of immunity. Eliason's motion was denied by the district court without a hearing because (1) the testimony was not compelled, (2) the defendant had not received

immunity, and (3) the government obtained the information from an independent source.

Shortly thereafter, Eliason entered a voluntary plea of guilty to the offense and agreed to cooperate with the government and provide truthful information in exchange for a sentencing recommendation of eighteen months imprisonment. In the plea agreement, Eliason specifically preserved his right to appeal the district court's refusal to hold a *Kastigar* hearing.

Prior to the sentencing of Eliason, the district court reviewed the Presentence Investigation Report ("PSI") which detailed twenty-three arrests and ten convictions over a twenty-year period. The offenses varied from forgery to narcotics violations. The PSI also reported that Eliason had been charged with homicide in 1981 and was convicted but the conviction was subsequently appealed and reversed, on retrial he was acquitted. Additionally, the PSI recounted an interview with FBI Special Agent James Gretz in which Gretz offered his opinion that Eliason's voluntary cooperation coupled with the fact that he had ceased all criminal activities since 1987 demonstrated that Eliason had exhibited a conscientious desire to reform. Despite the recommendation, the trial court rejected the government's eighteen-month sentencing recommendation and imposed a sentence of thirty-six months in confinement.

## II. *ISSUES*

On appeal, Eliason raises two issues. He argues that the district court erred in refusing to conduct a *Kastigar* hearing to determine whether the government used immunized testimony against him, and he argues that the district court erred in sentencing him to thirty-six months despite the government's recommendation for an eighteen-month sentence.

## III. *DISCUSSION*

### A. Denial of the Kastigar *Hearing*

■■■ Eliason challenges the district court's denial of his motion for a *Kastigar*

---

1. The transcript of the March 17, 1987 Florida guilty plea hearing in which Eliason received immunity from prosecution for stolen property in Florida is not part of the appellate record. Elia-

son and his counsel in that proceeding have filed affidavits explaining that Eliason provided information regarding the stolen Nissan 300ZX both before and after receiving a grant of immunity.

hearing to determine whether immunized testimony was improperly utilized by the federal prosecutor in preparing the charges in this case. In *Kastigar*, the Supreme Court held that the federal immunity statute, 18 U.S.C. § 6002, provides a witness protection from prosecution that "is coextensive with the scope of the privilege against self incrimination" under the Fifth Amendment. 406 U.S. at 453, 92 S.Ct. at 1661. The Court concluded that a defendant raising a claim under the federal immunity statute "need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Id.* at 461–62, 92 S.Ct. at 1665; *see also* 18 U.S.C. § 6002 ("no testimony or other information compelled under [this immunity statute] (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, [or] giving a false statement . . ."). Thus, if a defendant is able to establish through relevant evidence that he gave compelled testimony in a court proceeding based upon a promise of immunity, the government must come forth with evidence that the information it purports to use against the defendant came from a source independent of the defendant's immunized testimony. *Kastigar*, 406 U.S. at 460–62, 92 S.Ct. at 1665.

■ A defendant may also be entitled to a *Kastigar* hearing when he provides evidence that is compelled, for example, under a threat of contempt after the witness invokes the privilege against self-incrimination.[2] Testimony given under compulsion invokes a defendant's constitutional rights against self-incrimination. *See Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). In *Murphy*, the defendants refused to testify in hearings before the Waterfront Commission of New York Harbor on the grounds that their answers

might incriminate them. *Id.* at 53–54, 84 S.Ct. at 1596. The defendants were granted immunity from prosecution under the laws of New Jersey and New York but they still refused to testify because they feared their answers might incriminate them under federal law. *Id.* They were held in contempt of court and the New Jersey Supreme Court upheld the civil contempt judgments. *Id.* The United States Supreme Court reversed the New Jersey Supreme Court and held that "the constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law." *Id.* at 77–78, 84 S.Ct. at 1609. Thus, based on the fact the defendants invoked the privilege against self-incrimination, *Murphy* rejected a line of cases that held "one jurisdiction within our federal structure may compel a witness to give testimony which could be used to convict him of a crime in another jurisdiction." *Id.* at 77, 84 S.Ct. at 1608; *see also United States v. Jordan*, 870 F.2d 1310, 1316 (7th Cir.) (in *Murphy* the Supreme Court "held that one sovereign could not *compel* testimony which might subject the witness to prosecution by another sovereign"), *cert. denied*, 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989).

■ Compelling a suspect to give testimony is not the only source of a prosecutorial obligation to refrain from using information; such an obligation also may arise as part of an agreement under which the suspect provides information in exchange for a promise from the prosecutor not to use it against him (use immunity) or, not to prosecute at all (transactional immunity). *See, e.g., United States v. Murphy*, 768 F.2d 1518, 1532 (7th Cir.1985), *cert. denied*, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986); *United States v. Lyons*, 670 F.2d 77, 80 (7th Cir.) ("[a]ny agreement [concerning immunity] made by the government must be scrupulously performed and kept"), *cert. denied*, 457

---

**2.** "The hallmark of compulsion is the presence of some operative force producing an involuntary response. Compulsion is not present where the act proceeds from the exercise of choice or free will, self-impelled and freely undertaken, and unconstrained by interference. And, of course, the response must be free from improper influences (e.g., fear, ignorance, trickery, etc.) such as would render it less than the exercise of unfettered free will."
*United States v. Escandar*, 465 F.2d 438, 442 (5th Cir.1972).

U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). Agreements of this nature are enforced not because of the self-incrimination clause but because the due process clause requires prosecutors to scrupulously adhere to commitments made to suspects in which they induce the suspects to surrender their constitutional rights in exchange for the suspects giving evidence that the government needs against others which simultaneously implicates themselves. *See, e.g., Santobello v. New York,* 404 U.S. 257, 261–63, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427 (1971). Thus for Eliason to prevail in his claim, he must establish either (1) that during the state plea negotiations he provided information to the government in exchange for a prosecutorial promise not to use that information in proving additional charges against him; or (2) that he was compelled to testify by the State of Florida after he invoked his privilege against self-incrimination.

Rather than attempting to establish that he had an agreement prohibiting the federal government from using his statement against him or that he was compelled by the State of Florida to testify under a threat of contempt, Eliason makes the allegation that a grant of immunity from the state followed by the witness providing information to the state prosecutor is sufficient to automatically trigger the protections of *Kastigar* and *Murphy* in a subsequent federal prosecution. Not surprisingly, the defendant overlooks the essential factor necessary to invoke the right to a *Kastigar* hearing: *compulsion.* The record is barren of any allegation much less evidence that the state authorities compelled Eliason to provide information to them, i.e., he neither provided testimony under subpoena nor under a threat of contempt. Although there is no transcript of the state plea negotiation, the affidavits submitted to the

district court by Eliason and his counsel in the state proceedings demonstrate that there was no compulsion for Eliason to provide information to the state authorities and that the defendant volunteered information to the state authorities in hope of reducing the charges against him. In fact, as the district judge found, there is no evidence in the record that Eliason ever was a party to any immunity proceedings in the State of Florida. Rather, it appears that he merely engaged in a plea-bargaining session in which he agreed to plead guilty to a narcotics charge in exchange for the state dropping the stolen property charge.[3] If Eliason wanted to limit the use the federal government could make of the information he provided to Florida prosecutors, he and his counsel were obliged to follow the accepted procedures and at least make an attempt to obtain such an agreement or promise from the federal government. *See, e.g., infra* at 1154 (discussing *United States v. Palumbo,* 897 F.2d 245 (7th Cir.1990), and *United States v. Brimberry,* 744 F.2d 580 (7th Cir.1984), *cert. denied,* 481 U.S. 1039, 107 S.Ct. 1977, 95 L.Ed.2d 817 (1987)).

Nowhere in the record is there any evidence that Eliason formally invoked the privilege against self-incrimination, that he received immunity under Florida's immunity statute, much less under the federal immunity statute or that the federal authorities at any time agreed not to use Eliason's statement against him. *Cf. Murphy,* 378 U.S. at 53–54, 84 S.Ct. at 1596 (in which the defendants invoked the privilege against self-incrimination). In *United States v. Roberson,* 872 F.2d 597, 611–12 (5th Cir.1989), *cert. denied,* 493 U.S. 861, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989), the Fifth Circuit squarely rejected any idea that information provid-

---

**3.** In Eliason's affidavit submitted to the U.S. district court, he stated:

"On March 17, 1987, I pleaded guilty to drug charges that were pending against me in the Circuit Court of Hillsborough County in Tampa, Florida. At the time of my guilty plea, a charge for dealing in stolen property relating to my sale of a 300 ZX Nissan to a Mr. Winters was dismissed and I was given immunity from prosecution in exchange for my willingness to cooperate with the Tampa Police Department in its investigation of several matters, includ-

ing an investigation of dealing in stolen cars on my part and the parts of others with whom I was involved at the time."

It appears that Eliason is mistakenly using the term "immunity" to describe the stolen property charge being dropped by the State of Florida but even if Florida did grant immunity, that does not bind the federal government. *See United States v. Roberson,* 872 F.2d 597, 611–12 (5th Cir.), *cert. denied,* 493 U.S. 861, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989).

ed to the state authorities pursuant to a plea agreement was entitled to the same immunity provided for compelled testimony:

"Patently, *Murphy* is distinguishable from the instant case. In *Murphy*, the defendant was stuck between the proverbial rock and a hard place: He could testify, and incriminate himself, or he could invoke the fifth amendment, and risk contempt charges. As a result, the defendant had no real choice but to testify, a result which would offend fifth amendment principles. Preserving the values underlying that amendment was critical to the *Murphy* court.

To the contrary, in this case Roberson was not compelled to do anything. He bargained with the state, convincing it to forgo state property offense charges and the death penalty in exchange for his cooperation. Roberson does not suggest that the state coerced him to accept the agreement or that he did not understand its terms; there is no reason why he could not have demanded federal immunity or refused to cooperate. Neither the state nor the federal prosecutor ever forced Roberson to incriminate himself; hence, the interests that were critical to the *Murphy* court are not involved here."

*Id.* Thus, *Roberson* held that information a defendant *voluntarily* provides during state plea negotiations is different than testimony obtained under a threat of contempt because the former is not compelled. Accordingly, the court held that information voluntarily given during state plea negotiations may be used by federal prosecutors against a defendant in a subsequent federal prosecution.

Eliason points to two decisions from this court to support his contention that *Kastigar* applies when the defendant has voluntarily provided information in the course of plea negotiations. *See United States v. Palumbo,* 897 F.2d 245 (7th Cir.1990), and *United States v. Brimberry,* 744 F.2d 580 (7th Cir. 1984), *cert. denied,* 481 U.S. 1039, 107 S.Ct. 1977, 95 L.Ed.2d 817 (1987). The defendant's reliance on *Palumbo* and *Brimberry* is misplaced because in each of these cases the federal government entered into an agreement with the respective defendants barring the federal government from using the information obtained from the defendant in a federal prosecution against the defendant. In *Palumbo,* prior to engaging in plea negotiations, the federal prosecutor promised not to use the proffered testimony in a federal prosecution. 897 F.2d at 247. In *Brimberry* the defendant voluntarily provided evidence during a plea negotiation with the federal prosecutor which the government made use of against him in a federal grand jury proceeding. 744 F.2d at 585–86. Thus, both *Palumbo* and *Brimberry* were "contract" cases resulting from plea negotiations with the federal government. *See id.* at 586; *United States v. Brown,* 979 F.2d 1380, 1381 (9th Cir.1992) ("the Government is not bound by the procedures and requirements of the use immunity statute when granting immunity in the form of a contractual agreement, and ordinary contract principles apply when interpreting the agreement"). In the instant case, there is no mention in the record of any agreement between the State of Florida and Eliason binding the federal government from using the information Eliason provided to state authorities, indeed, as *Roberson* held, the State of Florida is without authority to bind the federal government in such a contract. "If state agreements that immunize criminal defendants from state charges could bind federal prosecutors, state prosecutors would be able to usurp federal prosecutorial discretion." *Roberson,* 872 F.2d at 611.

As in *Roberson,* Eliason voluntarily plea-bargained with the state. Eliason convinced the State of Florida to drop stolen property charges against him in exchange for his continued cooperation in giving truthful testimony when called upon and his entry of a guilty plea to narcotics charges. The distinction between compelled testimony as opposed to information voluntarily given is well-stated in *Roberson* and applies here. *Roberson,* 872 F.2d at 611–12. In the final analysis, Eliason is attempting to expand the immunity doctrine in a fashion that no court has ever recognized; we also refuse to be a party to this expansive maneuver. We hold that Eliason's argument that information *voluntarily* provided during *state* plea negotiations results in immunity from *federal* prosecution is

without merit and we thus affirm the trial court's refusal to hold a *Kastigar* hearing.

### B. *Sentencing Challenge*

■■■ Because the crime for which the defendant was convicted was committed before November 1, 1987, the United States Sentencing Guidelines are not applicable. *United States v. Morris*, 957 F.2d 1391, 1403 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 380, 121 L.Ed.2d 290 (1992). In *Morris*, we stated that " '[m]ounting a challenge to a statutorily authorized sentence is an uphill struggle ... Sentences within the maximum term provided by Congress are reviewable in this circuit only for a manifest abuse of discretion ... A district court abuses its discretion if it relies upon inaccurate information in exercising its discretion, or fails to exercise any discretion at all.' " *Id.* (quoting *United States v. Threw,* 861 F.2d 1046, 1049 (7th Cir.1988)) (citations omitted). When a sentence is challenged because it is allegedly based on materially erroneous information, the defendant must demonstrate "the challenged information is (1) false or unreliable, and (2) demonstrably made the basis for the sentence." *United States v. Perez,* 858 F.2d 1272, 1275 (7th Cir.1988) (quotations omitted). The defendant points to two statements made by the sentencing judge as evidence that the court relied on erroneous information when sentencing Eliason. The court stated:

> "I have rarely seen a criminal history as serious as yours, Mr. Eliason. 23 prior arrests, 10 prior convictions, including a conviction for murder, although I realize that conviction was reversed on appeal, you were acquitted in the second trial. I note in your criminal history that on one occasion at least you violated probation, on another occasion you violated the terms and conditions of parole. You were an absconder from parole.
>
> I also note that you used aliases, you've used an alias or aliases in connection with at least the arrest in Florida in September of 1986."

Later in the sentencing proceeding the court commented, "I also think the government's recommendation of an 18–month sentence is inappropriate in this case. I think it demeans the seriousness of the conduct, I think it demeans the seriousness of your criminal history, Mr. Eliason, and I'm not going to follow the recommendation."

This case is quite similar to *United States v. Plisek,* 657 F.2d 920 (7th Cir.1981), in which the sentencing court made repeated references to a defendant's prior arrest for murder and subsequent acquittal. In concluding that the court's references to the acquittal for murder did not improperly taint the sentencing, we stated "[t]he sentence was clearly based on (1) the serious nature of the offense, and (2) the *entire* background, characteristics, and life of the defendant without placing any undue reliance on the prior acquittal." *Id.* at 928. Likewise in the case before us, we are of the opinion that the sentencing judge did not abuse her discretion in referring to Eliason's entire record including his prior murder conviction, its subsequent reversal and his acquittal of the charge on retrial. The judge was merely reviewing his extensive criminal history—as she must—which obviously influenced her decision to sentence him above the government's recommendation of eighteen months, but well below the statutory maximum of five years. The record is barren of facts supporting Eliason's claim that the judge grounded her ruling on "false or unreliable" information that "demonstrably made the basis for the sentence." *Perez,* 858 F.2d at 1275.

### IV. *CONCLUSION*

The district court neither committed error in denying Eliason a *Kastigar* hearing nor in sentencing him to thirty-six months of confinement. The judgment of the district court is

AFFIRMED.