**UNITED STATES Of America,
Plaintiff,**

v.

**J. Christopher ROBERTS, and Robert
Burns, Defendants.**

**No. CRIM.A. 02–94–SLR.**

United States District Court,
D. Delaware.

Aug. 14, 2003.

Colm F. Connolly, United States Attorney, Richard Andrews, Assistant United States Attorney, Keith Rosen Assistant, United States Attorney, Edmund Falgowski, Assistant United States Attorney, United States Attorney's Office, District of Delaware, Wilmington, Delaware, for Plaintiff United States of America.

Solomon L. Wisenberg, Carmen R. Kelley, Marc Rindner, Ross, Dixon & Bell, L.L.P., Washington, D.C. Eugene Maurer, Wilmington, Delaware, for Defendant J. Christopher Roberts.

Marc S. Raspanti, Kevin E. Raphael, Miller, Alfano & Raspanti, P.C. Philadelphia, Pennsylvania, for Defendant Robert Burns.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

### A. The Indictment

On July 24, 2002 a federal grand jury for the District of Delaware returned a five count indictment[1] against J. Christopher Roberts ("Roberts") and Robert Burns ("Burns") concerning their purported acts to wrongfully influence the land use business in New Castle County, Delaware during the fall of 1998. (D.I.1)

The indictment charges that in October 1998, Roberts, a New Castle County ("N.C.C.") Councilman, contacted an intermediary[2] to inform Burns that "the blacktop job would cost $5,000." Burns worked for Mario Capano[3] ("Capano"), who had

---

1. Roberts was charged with violating 18 U.S.C. §§ 1951, 1952; 18 U.S.C. § 666(a)(1)(B), (b) & (d); 18 U.S.C. § 1512(b)(3). (D.I.1) Burns was charged with conspiracy to commit bribery in violation of 18 U.S.C. § 371. (D.I.1) A superseding indictment as to Count V against Roberts was returned on February 13, 2003. (D.I.58) The superseding indictment is subject to a motion to dismiss. (D.I.74)

2. Although unidentified by the indictment, the court understands that Tony Domino is the intermediary referenced. (D.I. 88 at 88); *United States v. Capano*, Criminal Action No. 00–81–SLR. (D.I.10) The record indicates that Domino signed an immunity agreement and made a proffer with the United States Attorney's Office for the District of Delaware in February 2000. (D.I. 92 at 72)

3. While identified as a "separately charged co-conspirator" (D.I. 1 ¶ 9), a one count felony information was filed against Capano on December 8, 2000. *United States v. Capano*, Criminal Action No. 00–81–SLR. (D.I.1) On February 13, 2001, Capano waived indictment and entered a plea of guilty to conspiracy to commit bribery in violation of 18 U.S.C. § 666(a)(2), (b) and (d) and 18 U.S.C. § 371. Capano was released on his own recognizance pending sentencing. (*Id.;* D.I. 7) As

an interest in a housing project in N.C.C. called Chaddwyck ("Chaddwyck"). It is alleged that the payment was to ensure that the recordation vote for the Chaddwyck development would be passed by N.C.C. Council without difficulty. Absent approval by N.C.C. Council, the Chaddwyck development could not be lawfully constructed.

To that end, on or about October 23, 1998, Capano gave Burns an envelope containing $5,000 in cash, and Burns delivered the envelope to the intermediary. Roberts then, allegedly, obtained the envelope from the intermediary. Roberts is also charged with witness tampering based on his purported attempt to conceal the alleged machinations. (D.I.58)

## B. Pretrial Motions

This straightforward transaction occurring over four years ago has spawned a barrage of pretrial motions challenging the integrity of the prosecution and the motives of the prosecutors involved. On November 25, 2002, Roberts filed the following: 1) motion to sever trial from Burns (D.I.21); 2) motion to dismiss indictment due to pre-indictment delay (D.I.22); 3) motion to dismiss based on vindictive prosecution (D.I.23); and 4) motion to dismiss count V of the indictment for failure to charge an offense (D.I.24, 74). On the same day, Burns moved to dismiss the indictment with prejudice based on a purported immunity from prosecution agreement and to sever the trial. (D.I.25, 30)

The defendant United States of America ("government") filed opposition to the motions (D.I.31, 32, 33, 35, 37, 38) and defendants timely replied. (D.I.44, 46, 47, 48, 49, 53)

The court conducted a status conference with the parties on February 4, 2003. (D.I.55) Over the government's objections, the court set an evidentiary hearing for February 20, 2003 regarding: 1) Burns' motion to dismiss based on an alleged immunity agreement; and 2) Roberts' motion to dismiss based on vindictive prosecution "given that the very nature of the charge requires a factual inquiry." (D.I.56) The remaining motions would be resolved without oral argument. The government filed a superseding indictment as to count V against Roberts on February 13, 2003. (D.I.58) The court granted the government's motion to dismiss count V of the original indictment on February 25, 2003. (D.I.63)

Because severely inclement weather affected the ability of counsel to prepare for the proceeding (D.I.59), the evidentiary hearing was rescheduled to March 24, 2003. (D.I.60) On March 5, 2003 Roberts moved to compel discovery related to the evidentiary hearing. (D.I.66) By order dated March 17, 2003, the court granted in part and denied in part Roberts' motion:

> The court is cognizant that the timing of an indictment alone will not overcome the presumption of prosecutorial regularity on the ultimate issue of vindictive prosecution. However, for purposes of

part of the plea agreement, the government agreed to not prosecute Capano for any other "white collar" federal criminal offenses that were the subject of investigations known to the United States Attorney's Office for the District of Delaware. (*Id.* at 6) If Capano satisfactorily complies with the terms of the plea agreement, the government has agreed to file a downward departure motion pursuant to U.S.S.G. § 5K1.1, 28 U.S.C. § 994(n), and

18 U.S.C. § 3553. (*Id.*) During his change of plea hearing, Capano identified Roberts as the N.C.C. Councilman he attempted to bribe. During this plea colloquy, Capano also averred that the payment was to assist Roberts' reelection campaign. (D.I. 92 at 98) By order dated August 19, 2002, the court granted the government's motion to indefinitely continue Capano's sentencing hearing. (*Id.*, D.I. 18)

discerning the truth through discovery, the court concludes that the objective facts of record "rise beyond the level of unsupported allegations" and warrant some limited discovery of the government's proof in this regard. (D.I.69) Essentially, the government was ordered to produce all documents related to the timing of the indictment as well as a list of witnesses to be called and their statements. (D.I.69) On the same day, the government moved to quash the subpoenas that Roberts had served on United States Attorney Colm F. Connolly ("Connolly"), Assistant United States Attorneys Edmond Falgowski ("Falgowski"), Robert J. Prettyman ("Prettyman") and Keith M. Rosen ("Rosen"). (D.I.68) Alternatively, the government sought a protective order to preclude Roberts from calling the government attorneys as witnesses absent a sufficient proffer that their testimony would be favorable and material to the defense.

By order dated March 20, 2003, the court granted the government's motion for a protective order. Roberts was precluded from calling Connolly, Falgowski, Rosen or Prettyman "unless and until defendant provides the court with a satisfactory proffer as to how each of these witnesses will provide favorable and material testimony. See generally United States v. Cruz-Jiminez, 977 F.2d 95, 100 (3d Cir. 1992)." (D.I.75) On the same day, Ronald J. Williams ("Williams"), the Assistant Editor of the editorial page for The News Journal ("News Journal"), moved to quash a subpoena to testify served on him by Roberts. (D.I.71, 72, 73) The testimony sought related to Williams' October 15, 2002 article that quoted unidentified sources close to the Roberts' investigation who opined that the government would not have pursued the indictment if Roberts had retired from his N.C.C. Council seat instead of filing for reelection. (D.I. 73; DX 11)

Against this procedural backdrop, the court conducted a two-day evidentiary hearing on March 24 and March 27, 2003. (D.I.88, 92, 83,) The court has jurisdiction pursuant to 18 U.S.C. § 3231. The following are the court's findings of fact pursuant to Federal Rules of Criminal Procedure 12(d).

## II. FINDINGS OF FACT

1. Lawrence Sullivan ("Sullivan") has been the Public Defender for the State of Delaware for 32 years. (D.I. 88 at 5–6) The Public Defender is appointed by the Governor and confirmed by the Delaware Senate. (Id.) Sullivan supervises 63 attorneys who handle 33,000 cases a year throughout the State.

2. In September 1998, Sullivan also maintained a small private law practice and performed legal work for Capano [4] and his corporation. (Id. at 7, 56) In connection with this legal work, Sullivan met and worked with Burns. (Id. at 62)

3. In September or October of 1998, Sullivan was contacted by Mel Slawik ("Slawik") on behalf of Capano. (Id. at 9) Slawik is the psycho-forensic evaluator for the Public Defender's Office. Prior to his hiring by the Public Defender Office, Slawik was the N.C.C. Executive "who had some problems with the law and spent some time in jail." (Id. at 9) Slawik contacted Sullivan on behalf of Capano and told him that Councilman Roberts had requested a $5,000 payment or assessment from Capano to ensure his support for the Chaddwyck project. (Id. at 10, 11, 57) Sullivan considered this wrong and extor-

---

4. Capano is the owner of numerous companies that develop properties in Delaware, specifically New Castle County. (Id. at 53) Capano had a financial interest in Chaddwyck.

tionate. (*Id.* at 11, 12) In exchange for this information, Capano demanded immunity from prosecution. (*Id.* at 12)

4. Because Sullivan had helped Tom Gordon ("Gordon") become elected as N.C.C. Executive on a platform of eliminating political corruption, he called Gordon to discuss Slawik's information. (*Id.* at 13, 11, 15) Sullivan and Gordon have a personal and professional relationship spanning 25 years from when Gordon was a N.C.C. police officer and then later N.C.C. chief of police. (*Id.* at 12–13, 60, 90) Sullivan considered Gordon the chief law enforcement officer for N.C.C. and trusted him. (*Id.* at 13, 37) Sullivan has also known the N.C.C. Chief Administrative Officer, Sherry Freebery ("Freebery"), for many years. (*Id.* at 13, 60) Despite a few phone call attempts, however, Sullivan was unable to reach Gordon. (*Id.* at 11)

5. Contemporaneous with Sullivan's phone call attempts, the recordation vote for the Chaddwyck project was placed on the calendar for review by N.C.C. Council. Because any delay could adversely affect financing of the Chaddwyck project, Capano authorized Burns to pay $5,000 to Roberts. (*Id.* at 57–58, 89) On October 22 or 23, 1998, Burns delivered an envelope containing $5,000 in cash to the intermediary to give to Roberts. (*Id.* at 89) On October 27, 1998, the N.C.C. Council approved the recordation plan for Chaddwyck. *United States v. Capano*, Criminal Action No. 00–81–SLR. (D.I.6)

6. Sullivan and Gordon finally spoke about a week later. (*Id.* at 14, 57) Sullivan conveyed Slawik's information and, at that point, Gordon agreed to provide immunity from prosecution to Capano. (*Id.* at 14) Sullivan then informed Slawik that Gordon "agreed that he would do some-

thing about it and that immunity would be no problem." (*Id.* at 15) Sullivan contacted neither federal agents nor prosecutors to discuss the information or the idea of immunity for Capano. (*Id.* at 43, 44)

7. On October 28, 1998, Sullivan, Gordon, Freebery, Capano and Slawik met at Sullivan's private law office. (*Id.* at 15, 16, 58, 93) Before the discussion started, Capano questioned whether he would be receiving immunity for his information. (*Id.* at 19, 60) Because Capano had received immunity from prosecution on unrelated issues in the past, he knew how immunity worked and understood that to speak without such a guarantee might have self-incriminating consequences. (*Id.* at 60, 61) Gordon and Freebery assured Capano that immunity would be granted. (*Id.* at 19, 20) By this time, Sullivan was acting as Capano's attorney. Neither Freebery nor Gordon told Sullivan that anyone else would have to be consulted for authorization on the issue of immunity. (*Id.* at 21) There was no mention of the federal government or federal prosecution. (*Id.* at 21) Based on Sullivan's extensive dealings with immunity in criminal cases, it was not unusual for the federal government to be absent at this point in the investigation. (*Id.* at 22) After the immunity was confirmed, Capano informed Gordon and Freebery about the $5,000 assessment solicited by Roberts. (*Id.* at 64, 18, 22, 61)

8. At this point, it became clear that Capano never actually spoke with Roberts. (*Id.* at 23, 29) Instead, Capano's employee, Burns,[5] had all of the direct conversations with Roberts. (*Id.* at 23, 62) Capano indicated that Burns was an integral part of the deal and that he, too, needed immunity from prosecution. (*Id.* at 65) The group decided to contact Burns and invite him to the meeting. (*Id.* at 24, 29) Reaching

---

5. Burns has worked for Capano for over ten years. (*Id.* at 54)

Burns at a restaurant, Capano told him to report to Sullivan's law office right away. (*Id* at 24, 65, 66, 91)

9. When Burns arrived, it was apparent from his facial expression that he was unaware of the reason for his summons to Sullivan's law office. (*Id.* at 24) Capano informed Burns that they would be working with the government to solve the assessment problem. (*Id.* at 25) Burns became upset and Capano tried to calm him. (*Id.* at 25, 70, 94) Although Capano explained that an immunity agreement had been reached, Burns remained uncooperative and denied knowledge of the $5,000 assessment. (*Id.* at 25, 95) Freebery advised Burns that in exchange for a truthful recitation of the events, he would be given immunity from prosecution. (*Id.* at 95)

10. Capano and Burns were then left alone. (*Id.* at 26, 69) During their private conversation, Burns asked Capano to care for his family, especially his sick wife, if he went to jail. (*Id.* at 70) While Capano agreed to help, he assured Burns this would be unnecessary as immunity was guaranteed. (*Id.* at 70) At this point, Sullivan also began representing Burns. (*Id.* at 71, 96) After a few minutes of reassurances, Burns was ready to cooperate. (*Id.* at 27) Sullivan would have forbidden either of his clients from speaking further if he had doubted that immunity from prosecution would be honored. (*Id.* at 28)

11. Burns' version of the story was the same as Capano's, except richer in detail. (*Id.* at 29) Burns indicated that the $5,000 assessment was for Roberts' help to move the Chaddwyck project through the N.C.C. Council's recordation vote. (*Id.* at 35) Roberts had been shepherding the Chaddwyck project before the N.C.C. Council. Roberts and Burns had worked together

on Chaddwyck and had a favorable professional relationship. (*Id.* at 62, 88)

12. At the time the money was paid, Roberts was seeking reelection for his N.C.C. Council seat. (*Id.* at 73, 88)

13. At the end of the three-hour meeting, there was no indication that the immunity promised was discontinued or that additional authorization (e.g., from the federal government) was necessary. (*Id.* at 22, 29, 30, 31, 36) A formal immunity document was not prepared. (*Id.* at 33) The group did consider whether to arrest Roberts immediately. (*Id.* at 83) The election was scheduled for November 3, 1998. (*Id.* at 73) The group decided instead to formulate a "sting operation" to gather more incriminating evidence against Roberts. (*Id.* at 30, 100)

14. The next day, October 29, 1998, Freebery and two high ranking members of the N.C.C. police arrived at Capano's office building to implement a sting operation against Roberts. (*Id.* at 30, 73, 74, 76, 84, 101) The plan was to stage and tape record a telephone conversation initiated by Burns to Roberts in order to obtain incriminating evidence. (*Id.* at 30, 74, 100) After the police recording equipment failed, Burns allowed them to use his phone recording equipment because he wanted to help and believed he was protected by immunity. (*Id.* at 101, 105) The police gave Burns a script to follow in an effort to coax Roberts into discussing the $5,000 assessment. (*Id.* at 102) Pursuant to police guidance, Burns called Roberts and two telephone calls were recorded.[6]

15. Also on October 29, 1998, N.C.C. police placed a courtesy call to the Federal Bureau of Investigation ("FBI") to apprize them of the Burns/Capano allegations. (D.I. 92 at 63) N.C.C. police told the FBI of their plan to tape record a phone con-

---

6. The content of their conversation is irrelevant for purposes of the immunity agreement.

versation between Roberts and Burns, in hopes of obtaining incriminating evidence. (*Id.* at 68) The FBI neither authorized nor directed the sting operation. (*Id.* at 69; DX 15) Jeffrey Troy, Supervisor and Senior Resident Agent of the FBI ("SSRA Troy"), Acting United States Attorney ("USA") Richard Andrews and Assistant United States Attorney ("AUSA") Prettyman decided to defer an active investigation until after the November 3, 1998 state elections.[7] (*Id.* at 63; DX 15) This conclusion was predicated on the government's reluctance to commence anything that might interfere with or influence the political process.[8] (*Id.* at 66–68) These federal officers did not question the nature of Burns' cooperation, although clearly aware of the fact of Burns' cooperation.

16. Major James Hedrick of the N.C.C. police met with representatives of the United States Attorney's Office ("USAO") and the FBI to discuss the allegations on November 3, 1998. They agreed the FBI would take over the investigation and all of the information and evidence collected by N.C.C. police was turned over to the FBI. (D.I.98, Ex. A) Consequently, N.C.C. police closed its independent investigation.

17. A few days later, Gordon called Sullivan to advise that Freebery had contacted the USAO about the "sting operation." (D.I. 88 at 35) Sullivan was astonished to learn that Freebery was told: "Mario Capano will get no more deals from this office." [9] (*Id* at 35–36) The government's refusal to recognize the immunity from prosecution promised by N.C.C. officials was contrary to Sullivan's experience. The deference given and informality associated with immunity agreements reached by local and federal law enforcement in the past was not honored by the government in this instance. (*Id.* at 46–47)

18. On November 17, 1998, after Roberts had been re-elected to N.C.C. Council, the FBI opened an official investigation into the allegations. (*Id.* at 60; DX 15) SSRA Troy supervised the investigation. (*Id.* at 59, 60) Troy's 16 years of experience with the FBI have been primarily in the area of white collar crime.

19. AUSA Prettyman was assigned to lead the prosecution and investigation in the USAO. At that time, 1998, Connolly also was an AUSA. (D.I. 83 at 121–122) Although Connolly did not work on the case, he was aware of the investigation.

20. In 1999, Keith Rosen became an AUSA and was assigned to the case to assist Prettyman. (D.I. 83 at 77, 19) To-

---

7. The text of the file memorandum reads: "Following discussions with Acting United States Attorney Richard Andrews, AUSA Robert Prettyman and SSRA Jeffrey Troy, it was decided that no active investigation should be conducted until after the state elections scheduled for November 3, 1998. Roberts, a candidate for reelection as N.C.C. Councilman in his district, was reelected in that election." (D.I. 98; DX 15)

8. As explained by Troy:
   The decision at that point in time was that it was very early on, we had just received information. Again, it's early on in the investigation. The decision was, we didn't want to be letting this information coming out and have it have an impact on the election at that time. We just wanted to go forth with our investigation and see what we had.
   Well, you could have an opponent of an elected official come forth and making a false allegation about that person, and then they could try and get the FBI to be involved in some way. If that got out, they could possibly use that to impact an election.
   (D.I. 92 at 66; 67–68)

9. Ironically, Capano did get another deal from the USAO, while his employee (Burns) is now facing federal charges in this case and yet another. *See United States v. Burns*, C.A. No. 03–68–SLR.

gether, the two prepared one formal prosecution memorandum. (D.I. 83 at 116)

21. In February 2001, SSRA Troy advised the USAO that Capano was ready to be charged. (D.I. 92 at 74) On February 13, 2001 Capano waived indictment and pled guilty to conspiracy to commit bribery. (*Id.* at 73)

22. In June 2001, SSRA Troy informed the USAO that the case against Burns was strong and that charges could be filed. (D.I. 92 at 73) About one month later, Troy advised the prosecutors that the Roberts case was ready for indictment. (*Id.* at 74) There were, nonetheless, disagreements in the USAO over the strength of the case. (*Id.* at 78)

23. The bulk of the investigative work was completed by August 2001, when the government was prepared to proceed with an indictment. (D.I. 83 at 101) Virtually no documentary evidence was produced between August 2001 and the day of the indictment in July 2002. (*Id.* at 101, 103; *see* GX 13)

24. On July 24, 2001, AUSA Prettyman was authorized to seek an indictment against Roberts. (D.I. 92 at 78–80; DX 13) The statute of limitations on the charges is five years and would expire in October 2003. (D.I. 83 at 111)

25. By August 2001, the USAO and Burns had reached a plea agreement. (D.I. 92 at 86) Rosen was prepared to present an indictment against Roberts to the grand jury. (D.I. 83 at 77–78; D.I. 92 at 78, 80) Shortly before the proceeding, however, Rosen was notified that there were problems with the Burns plea agreement that had to be addressed before proceeding with indictment. Subsequently, the plea negotiations broke down and the plea collapsed. Without the cooperation of the central witness to the alleged bribe, prosecutors determined to reevaluate the entire case and investigation. (*Id.* at 86, 78–80) The grand jury presentation of the Roberts indictment was not made in 2001 and the decision of whether to indict at all became open-ended. (*Id.* at 79; D.I. 83 at 40; D.I. 92 at 86)

26. After the Burns plea fell through, the focus of the investigation became how to proceed to indict Roberts without Burns. (D.I. 83 at 101) "[I]t was a question of analyzing the proof that [the government] did have as opposed to obtaining new proof." (*Id.* at 102) Although Burns was no longer cooperating, the government had already secured the assistance of two other witnesses, Capano and Domino. (*Id.* at 103) Nevertheless, the USAO did not move the prosecution forward at that time based on the evidence it had accumulated to date. (*Id.* at 81, 82, 106)

27. On September 4, 2001, Connolly was appointed USA for the District of Delaware. (D.I. 83 at 80, 121) As he was preparing to assume the USA position, Connolly knew that the case had been pending in the office for almost three years. Because it was such a high profile, well-publicized case and one of the more significant cases in the USAO, Connolly had hoped it would be resolved before he was appointed. (*Id.* at 122–123, 150)

28. On September 11, 2001, Rosen and Connolly spoke for the first time about the investigation as both stayed late in the office to monitor the tragic events of the day. (D.I. 83 at 81, 107) This was the first of repeated discussions about the case that they had between the fall of 2001 and the beginning of 2002. (*Id.* at 81, 106)

29. Although the FBI's focus post-September 11 became national security (D.I. 88 at 89), its investigation of the case at bar remained open until July 24, 2002, the day Roberts and Burns were indicted. (D.I. 92 at 85)

30. In November 2001, the USAO launched a major firearms initiative. (D.I. 83 at 82) Connolly assigned primary responsibility for the initiative to AUSA Prettyman. (*Id.* at 82)

31. In the early part of 2002 and after three years of work on the investigation, Prettyman was removed from the case. Connolly replaced Prettyman with AUSA Falgowski as the lead prosecutor on the case. This was the only one of Prettyman's cases transferred to Falgowski. (D.I. 83 at 112, 114) Rosen continued his work on the case. Despite appointing a new lead prosecutor, Connolly became actively involved in the investigation. (*Id.* at 125; GX 10) In February 2002, Connolly conducted part of an interview with Capano.[10] (*Id.* at 151) According to Connolly:

> The purpose of that meeting in my mind was I thought if I was going to have to ultimately make the decision whether to authorize the indictment, given Mr. Capano's role in the case, I wanted to see first-hand how he would present himself as a witness. That was why I thought it was important to be present at that meeting.

(*Id.* at 151) Connolly also interviewed Capano's banker. (*Id.* at 125)

32. When AUSA Falgowski took over the case he was told the investigation was ongoing. (D.I. 92 at 102; D.I. 83 at 31, 33) As a prosecutor in the USAO for eighteen years, Falgowski knew that there were disagreements over the merits of the case among prosecutors and case agents. (*Id.* at 41) At the time of the reassignment, Falgowski had about 50 other cases at unidentified stages of prosecution. (*Id.* at 103) The file given to Falgowski was over 10,000 pages long and contained about 100 interviews. (*Id.* at 103–104)

33. Connolly occasionally inquired about Falgowski's progress, but did not impose any deadlines for a decision. (*Id.* at 37) Falgowksi did not review every page of the 10,000 documents in the file. (*Id.* at 33) Falgowski, however, attended the interviews with Capano and his banker. (*Id.* at 36)

34. Patrick Turner was Roberts' legislative aide from December 2001 to September 2002. (D.I. 92 at 41) Turner's responsibilities included: scheduling; addressing constituent concerns; arranging meetings; reviewing legislative drafts from legal departments and legislation prepared by other N.C.C. Council members. (*Id.* at 42)

35. In May 2002, Turner was informed that Roberts intended to seek reelection as a Democrat in the primary election for N.C.C. Council. (*Id.* at 42; DX 1)

36. On June 1, 2002, Roberts participated in Separation Day, an annual celebration and parade in N.C.C. (*Id.* at 43; DX 2) Although not designated as a political event, the "majority of the people who are running for reelection will attend the [Separation Day] parade if they are currently in office." (*Id.* at 43) Generally, politicians who are not seeking reelection do not attend the event. (*Id.* at 46) While candidate challengers are not allowed to have an official role in the parade, they can distribute literature along the side lines during the parade. (*Id.* at 46) The Republican candidate challenging Roberts, Jim Weldon, was present at the parade.

37. Also attending were 50—60 Roberts supporters and volunteers. (*Id.* at 45; DX 6) They were wearing "Chris Roberts County Council" t-shirts with "Paid for By

---

**10.** The interview of Capano was conducted almost a year after Capano pleaded guilty and the government granted him immunity.

People for Roberts." Inflated balloons, bumper stickers and push cards were distributed by the Roberts supporters.

38. About a month later, Roberts participated in a similar parade in Delaware City. (*Id.* at 47; DX 3) Again, about 50—60 volunteers were present and their activities and give-aways were similar to those on Separation Day. On June 24, 2002, Roberts held an official fund-raiser attended by about 80 people. (*Id.* at 43, 49; DX 4) There was no effort to conceal his reelection campaign; to the contrary, his supporters were trying to "spread the word." (*Id.* at 57)

39. Sometime during the early weeks of July 2002, AUSA Falgowski and SSRA Troy had a telephone conversation about the case. (D.I. 92 at 76) Falgowski told Troy that the indictment would have to be presented to the grand jury before the election filing deadline, in order to avoid influencing any part of the election.[11] (*Id.* at 76) It was the collective decision of the USAO that the indictment would have to be presented as quickly as possible in order to beat the deadline.[12] (D.I. 92 at 85, 76, 80, 81, 85)

40. SSRA Troy did not agree with the decision to time the indictment to occur before the election deadline because the election should not have been considered at all. (*Id.* at 77) Instead, the merits of

the case had mandated that it be presented to a grand jury long before Falgowski's July 2002 decision. (*Id.* at 77) Troy was unaware that Roberts was actively campaigning for reelection in June 2002. (D.I. 92 at 75–76)

41. By the time Roberts filed officially for reelection on July 23, 2002, he had been informally running a campaign for approximately seven weeks. (*Id.* at 52) Roberts purposely filed so close to the primary deadline in order to evaluate the field of opposing candidates. (*Id.* at 52) When Roberts filed for reelection on July 23, there was no opposing candidate from the Democratic Party. After Roberts was indicted, another Democratic candidate joined the primary race. (*Id.* at 52, 56)

42. Wilmington is a close knit political community, with the many state jobs being politically connected. (*Id.* at 51) Because the state, county and city office buildings are located next to each other, there is much interaction among employees.

43. By July 2002, AUSA Falgowski had expended about 40 hours reviewing the file.[13] (*Id.* at 104) On July 16, 2002, Falgowski recommended to Connolly that the case be presented for indictment. (*Id.* at 105) Later that day Connolly, Andrews, Falgowski, Prettyman and Rosen had a impromptu meeting and decided to seek an indictment. (*Id.* at 106) During their ex-

11. They talked "about trying to get the indictment done prior to the filing deadline for the campaign for people to announce if they were running or not." (D.I. 92 at 76)

12. The government devoted most of its post-hearing briefing, not to the merits of the pending motions, but to the merits of the court's March 24, 2003 procedural ruling (D.I.76), whereby the government was called upon to rebut SSRA Troy's credible testimony that the indictment was timed with the election in mind, a proposition denied by the government in its initial papers. (D.I.35) Specifically, the government's memorandum

in opposition to Roberts' motion to dismiss left the impression that the timing of the indictment as related to Roberts' filing for reelection was a "coincidence." (D.I. 35, at 6–7 & n. 1; D.I. 83 at 56) Despite the nature of the charges at issue and the inconsistent evidence of record, the USAO apparently maintains that it should be immune from the light of public scrutiny. The court obviously disagrees, under the circumstances at bar.

13. Forty hours is the equivalent of a standard work week or less than two hours per week for the six months Falgowski had the file.

change, not all agreed on proceeding with an indictment.[14] Nonetheless, a September date was selected for presentment to accommodate Falgowski's summer vacation schedule. The following morning, however, Connolly reversed his decision and decided to seek an indictment expeditiously. (*Id.* at 107) He explained that he changed his mind when he suddenly realized that it was an even number year and, therefore, an election year. (*Id.* at 128, 107) Waiting until September was no longer acceptable to Connolly because the indictment would be returned after the September primary election and that would be unfair to the political process.[15] (*Id.* at 87)

44. The decision to indict was made a little over a week before the July 24, 2002 filing deadline. (*Id.* at 85) The prosecutors involved testified that they knew little about the pending election or the candidates running. Specifically, Falgowski, a Pennsylvania resident, relied on The News Journal as his source of information about Delaware. (*Id.* at 111) Falgowski acknowledged that federal prosecutors must be aware of anything that might be of assistance to a case. (*Id.* at 63) Although he had seen political advertisements for other candidates, Falgowski did not realize it was an election year until Connolly brought it to his attention on July 17. (*Id.* at 4) Falgowski, however, did realize that the N.C.C. Council is a four-year term and that Roberts had run in 1998. (*Id.* at 63) Nonetheless, Falgowski did not conduct any inquiries into Roberts' reelection sta-

tus. Had Falgowski realized earlier that it was an election year, he would have requested more time to work on the case so he could "expedite" his decision to prosecute. (*Id.* at 61–62)

45. The other prosecutor on the case, Rosen, likewise knew little about the status of Delaware's upcoming election. Rosen also is a Pennsylvania resident who does not follow Delaware politics. (*Id.* at 92) Despite the years expended on the investigation, Rosen did not know that there was a N.C.C. election for Roberts' seat in 2002. (*Id.* at 93) Although the crux of the case was an alleged bribe to help Roberts' reelection campaign in 1998, Rosen did not consider that Roberts would seek election again. Rosen was aware that the Department of Justice had an informal policy prohibiting federal prosecutors from doing anything that might affect the outcome of elections, including indicting public office holders prior to an election.[16] (*Id.* at 94)

46. Connolly knew that Roberts ran for reelection in 1998 because the alleged crime involved money for that campaign. Nevertheless, he testified that he did not focus on this fact when considering indictment until the evening of July 16, 2002. (*Id.* at 158)

47. Because Connolly and Rosen were uncertain about Roberts' reelection status on July 17, 2002, each decided to investigate on the Internet. (*Id.* at 130, 87, 130)

14. The breakdown of the prosecutors' opinions was presented to the court, *in camera,* and provides nothing more relevant than described above.

15. Connolly was
worried that it was possible that Mr. Roberts could be running for reelection and could be the declared Democratic candidate and then we would come along and indict him after the primary date, and I under-

stood that that could obviously harm his chances for re-election, if he were the candidate. And I was concerned that it would look like a very political partisan act, and thought it was an untenable situation.
(*Id.* at 128)

16. According to AUSA Rosen: "[T]here is consideration paid to that among the people in Washington in the Public Corruption Section" of the Department of Justice. (*Id.* at 95)

After searching for about 15 minutes, Rosen was unable to determine if Roberts were running. (*Id.* at 95, 88) Although Connolly's search yielded one web page that listed N.C.C. Council positions, he did not see Roberts' name listed. (*Id.* at 115, 131) Consequently, Connolly "concluded he was not a candidate at that point, although obviously I couldn't have known whether or not he had filed and it wasn't reflected on the web page." (*Id.* at 131) Neither Connolly nor Rosen called the N.C.C. Council to determine Roberts' filing status. (*Id.* at 140) Connolly did not investigate whether Roberts intended to file for reelection because he "didn't think about it." (*Id.* at 136, 138)

48. The FBI was not asked to investigate whether Roberts was campaigning for reelection nor to check on the status of his candidacy. (D.I. 92 at 87)

49. The decision to immediately indict created a scheduling problem for the USAO. The next grand jury would convene in less than a week, on July 23, 2002. Because all of the time slots were already taken for other cases, there was no time available to present the instant case. (*Id.* at 89, 91) Connolly decided that the grand jury panel would be asked to report again the very next day, July 24, 2002, for a special session to consider the case. (*Id.* at 108; GX 1)

50. On July 24, 2002, the grand jury convened for a special session and heard about four and one-half hours of testimony. Connolly was in the grand jury room when the case was presented.

51. George Casson, N.C.C. Superintendent of Sewer Maintenance, has been employed by N.C.C. for over 28 years. (*Id.* at 176) Jim Weldin, the Republican challenger for Roberts' N.C.C. Council seat, was Casson's boss at the Office of Community Governing. (*Id.* at 177) They were friends. (*Id.* at 177) About one to two weeks before the filing deadline in 2002, Casson met with Weldin. (*Id.* at 178) In response to Casson's questions about the campaign, Weldin indicated that the campaign was going well and that Roberts was going to be indicted very soon, leaving very little time for the Democratic Party to field another viable candidate. (*Id.* at 178)

## III. DISCUSSION

### A. Immunity Agreement

Defendant Burns moves to dismiss the indictment with prejudice based on the promise of immunity extended by the two highest ranking N.C.C. officials, Gordon and Freebery, in exchange for his information about an alleged assessment demanded by defendant Roberts. (D.I.25, 98) The information provided by Burns formed the substance of the indictment filed by the government on July 24, 2002. (D.I.1) Although the government and Burns did not have an immunity agreement in place, Burns asserts that the doctrine of equitable immunity should be applied to enforce the agreement made by N.C.C. officials.

▉▉▉ Generally, an immunity from prosecution agreement between a defendant and state actors is not binding on the federal government, unless the federal government has knowledge of and consents to the agreement. *United States v. Eliason*, 3 F.3d 1149, 1152 (7th Cir.1993); *United States v. Roberson*, 872 F.2d 597 (5th Cir.1989). It is undisputed that federal prosecutors were absent from the October 28, 1998 meeting with Capano, Burns, Sullivan, Freebery, Gordon and Slawik. Notwithstanding this absence, however, the court concludes that the government knew or should have known that Burns was a cooperating witness by November 1998.

Specifically, in response to the court's discovery order, the government produced two documents that demonstrate the FBI had knowledge of the Burns/Capano allegations soon after they surfaced. The court credits SSRA Troy's testimony that the FBI was informed of the allegations on October 29, 1998, the day Burns telephoned Roberts as part of the N.C.C. police sting operation. (D.I. 92 at 68–69) Although the FBI was aware that Burns was going to make the call, the sting operation was neither authorized nor approved by the FBI. (*Id.* at 69) A second memo dated November 17, 1998 is the request from the Wilmington FBI to open a file to investigate the Burns/Capano allegations. (D.I. 98; DX 15)

Having satisfied the knowledge prong of the inquiry, the issue of consent remains. There is no indication of record that the federal government expressly consented to the grant of immunity given to Burns by Gordon and Freebery or that Gordon and Freebery had the authority to bind the federal government absent its express consent. *See United States v. Fuzer,* 18 F.3d 517, 521 (7th Cir.1994); *United States v. Roberson,* 872 F.2d 597 (5th Cir.1989) (immunity from state prosecution agreement was not binding in federal prosecution because federal prosecutors never made an agreement with defendant); *United States v. D'Apice,* 664 F.2d 75, 78 (5th Cir.1981) (a federal prosecutor from one district cannot bind a federal prosecutor from a different district); *United States v. Cooke,* 650 F.Supp. 991, 994 (D.Md.1987) (immunity agreement enforced against federal government after court found it was a joint investigation between state and federal authorities). Therefore, the immunity agreement fails unless Burns can demonstrate that the facts of record compel application of the doctrine of equitable immunity. *See United States v. Goodrich,* 493 F.2d 390 (9th Cir.1974) (informal promises of immunity can be enforced by the courts when the circumstances are appropriate). In *Rowe v. Griffin,* 676 F.2d 524 (11th Cir.1982), the Eleventh Circuit Court of Appeals concluded that, as a matter of fairness, the government should be compelled to honor immunity agreements if the following criteria were satisfied:

1) an agreement was made; 2) the defendant has performed on his side; and 3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government.

*Id.* at 527–28. Applying a contractual analysis, the Eleventh Circuit determined that "when a promise of immunity induces a defendant to cooperate with the government to his detriment, due process requires that the prosecutor's promise be fulfilled." *Id.* at 524, 528.

Consistent with the analytical framework recited above, in this case the record conclusively demonstrates that a promise of immunity induced Burns to cooperate to his detriment in a criminal investigation directly related to the case at bar. Indeed, when the FBI agreed to take over the N.C.C. investigation in November 1998, it would not have been unreasonable to presume that a promise of immunity made in order to initiate an investigation would be honored by those who continued to benefit from the promise. Nevertheless, because the promise was made by N.C.C. officials, the question is whether the equities of record are so compelling as to justify the imposition of the immunity agreement on the federal officials who are prosecuting the case.

In this regard,[17] the Third Circuit Court of Appeals has recognized in principle a court's "inherent remedial power" to grant immunity, but has limited the exercise of that power to circumstances where "the government's decisions were made with the deliberate intention of distorting the judicial fact finding process." *United States v. Herman*, 589 F.2d 1191, 1203–1204 (3d Cir.1978). The record does not evidence such an intent. The fact that the local and federal law enforcement officials who investigated this case did so without the mutual trust or respect citizens might expect speaks volumes about local politics, but constitutes insufficient grounds for the extraordinary relief sought.

## B.  Vindictive Prosecution

The government's efforts to carry its burden of proof rests almost entirely upon testimonial evidence of its AUSAs and the USA himself. As a consequence, the demeanor and credibility of these witnesses was particularly significant. The court, therefore, has been careful to observe all aspects of each witness' testimony and assess how well that testimony met with the government's overall explanation of the reasons the indictment was timed as it was.

■■■ Prosecutors are afforded broad discretion in deciding whom to prosecute. *Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). Courts presume prosecutors have properly exercised their responsibilities unless there is clear evidence to the contrary. *See United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982); *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). "So long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision of whether or not to prosecute and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996).

■■■ The Due Process Clause of the Fifth Amendment "protects a person from being punished for exercising a protected statutory or constitutional right." [18] *United States v. Goodwin*, 457 U.S. at 372, 457 U.S. 368. The Supreme Court has held that "while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right." *Goodwin*, 457 U.S. at 372, 102 S.Ct. 2485; *Blackledge v. Perry*, 417 U.S. 21, 28–9, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). To punish a defendant because he has done what the law permits is a due process violation. *Bordenkircher v. Hayes*, 434 U.S. at 363, 98 S.Ct. 663; *United States v. Andrews*, 633 F.2d 449, 457 (6th Cir.1980); *U.S. v. Paramo*, 998 F.2d 1212, 1220 (3d Cir.1993).

■■■ As discussed, the court already determined that Roberts demonstrated a realistic likelihood of vindictiveness. The

---

**17.**  Albeit in the context of granting immunity to a defense witness, not a defendant.

**18.**  The specific legal right at issue is Roberts' candidacy for public office. *See Flinn v. Gordon*, 775 F.2d 1551, 1554 (11th Cir.1985). The government's opposition brief filed after the evidentiary hearing contends that the right to run for public office is not a protected right. In fact, the government devotes a large part of its brief (D.I.113) to attacking the underpinnings of defendant's argument. Although Roberts raised the vindictive prosecution argument in November 2002, and the government filed opposition thereto, the most recent opposition brief filed on May 23, 2003 contains arguments that for the first time challenge defendant's right to even assert a vindictive prosecution claim.

government now bears the burden of introducing legitimate, objective reasons for its conduct. *See United States v. Esposito,* 968 F.2d 300, 305 (3d Cir.1992); *United States v. Paramo,* 998 F.2d 1212, 1220 (3d Cir.1993); *United States v. Wilson,* 262 F.3d 305, 315 (4th Cir.2001); *United States v. Hooton,* 662 F.2d 628, 634 (9th Cir.1981). If the government presents legitimate reasons, the defendant must then demonstrate that the government's justification is pretextual and that actual vindictiveness has occurred. *See United States v. Contreras,* 108 F.3d 1255, 1263 (10th Cir.1997); *Paramo,* 998 F.2d at 1221.

■■■ The government presented the following as its objective reasons for timing the indictment the day after Roberts filed for reelection: 1) the Burns plea agreement fell through in August 2001; 2) Connolly was appointed USA in September 2001; 3) the events of September 11, 2001 diverted FBI resources from the case; and 4) USA Connolly assigned the case to a new lead prosecutor in February 2002. Defendants[19] contend that the above reasons are pretextual and were fabricated only after the court compelled discovery and invoked the presumption of vindictiveness against the government. Defendants recite to no other evidence, however, as proof of actual vindictiveness.

Contrary to the representations made by the USAO initially (D.I.35), the record clearly demonstrates that the indictment was timed with the 2002 election in mind. The court nevertheless concludes that the timing was not vindictive, i.e., "(1) the prosecutor harbored genuine animus toward the defendant … and (2) he would not have been prosecuted except for the animus." *United States v. Koh,* 199 F.3d

632, 640 (2d Cir.1999). The evidence instead suggests that this straightforward investigation[20] was poorly managed, supplying the groundwork for the suspicion that bad motive lay behind the timing of the ultimate charges. The fact that the lead prosecutors in this case operated in a vacuum, neither living in Delaware nor following Delaware politics or events, further impugned the integrity of the investigation when it was finally viewed in the context of real people and real events. The court does not believe that poor judgment on the part of the prosecutors is equivalent to vindictive prosecution or otherwise provides sufficient reason to dismiss the indictment at bar.

## IV. CONCLUSION

For the reasons stated, the motion to dismiss based on an immunity agreement and the motion to dismiss based on vindictive prosecution are denied. An order consistent with this memorandum opinion shall issue.

---

**19.** Burns' motion to join the motion for vindictive prosecution was granted by the court on May 22, 2003. (D.I.110)

**20.** Exploring a single allegation involving a single solicitation of a single $5,000 bribe by a single public official from a single citizen, each working through a single intermediary.